**WELLS FARGO BANK NORTHWEST, N.A., Plaintiff,**

v.

**TACA INTERNATIONAL AIRLINES, S.A and JHM Cargo Express, S.A., Defendants.**

**Taca International Airlines, S.A and JHM Cargo Express, S.A., Third-party plaintiffs,**

v.

**C–S Aviation Services, Inc., Third-party defendant.**

**No. 01 CIV.11484(GEL).**

United States District Court, S.D. New York.

Sept. 26, 2002.

Benjamin R. Nagi (Alan M. Unger, on the brief), Sidley Austin Brown & Wood LLP, New York, NY, for Plaintiff and Counterclaim–Defendant Wells Fargo Bank Northwest, N.A. and Third–Party Defendant C–S Aviation Services, Inc.

Michael P. Socarras (Joe R. Reeder, Timothy C.Bass, on the brief), Greenberg Traurig, LLP, Washington D.C. (Simon Miller, Jennifer Neuner, Greenberg Traurig, LLP, New York, NY, on the brief) for Defendants TACA International Airlines, S.A. and JHM Cargo Express, S.A.

## OPINION AND ORDER

LYNCH, District Judge.

This dispute involves five aircraft leased to TACA International Airlines ("TACA"), a Salvadoran airline company, by Wells Fargo Bank Northwest ("Wells Fargo"), a United States bank acting solely as owner-trustee under the lease agreements ("Leases"). Third–Party Defendant C–S Aviation Services ("C–S Aviation"), a "lease management provider" of commercial aircraft, established the trusts with Wells Fargo to lease the aircraft, negotiated and managed the Leases, and was the ultimate beneficiary of the trusts. Defendant JHM Cargo Express ("JHM Cargo"), an air cargo business and TACA subsidiary, was the original signatory on three of the Leases, and later assigned those Leases to its parent company, TACA, while expressly agreeing to remain fully liable for its obligations under the Leases.

Wells Fargo brings this lawsuit for payment of rent allegedly due under the Leases. TACA resists by asserting that it was fraudulently induced to enter the Leases, and counterclaims for (and brings a third-party action against C–S Aviation) for damages from the alleged fraud. Wells Fargo moves for partial summary judgment on its claims, and (joined by C–S Aviation) for dismissal of TACA's claims against it and C–S Aviation. The motions will be granted.

## BACKGROUND [1]

TACA does not dispute that it is party to five Leases—three that it assumed from defendant JHM Cargo for the use of three Airbus A300B4–200F aircraft and two that TACA itself executed for two additional Airbus A300B4–200F aircraft.[2] Each Lease contains a clause, commonly known as a "hell or high water clause."[3] that states:

> The Lessee's obligation to pay all rent and all other amounts due hereunder and to perform all the terms hereof shall be absolute and unconditional and shall not be affected or reduced by any circumstances, including (1) any set-off, counterclaim, recoupment, defense or other right which the lessee may have against the lessor . . . .

1. All facts set forth below are either undisputed or taken as alleged in TACA's pleadings.

2. TACA assumed the former three Leases from JHM Cargo by assignment agreements dated November 25, 1998, and January 27, 1999. (Seery Aff. Exs. 4–6.) Under the assignment agreements JHM Cargo agreed to "continue to be fully liable" to the lessor for "full and prompt payment" of its obligations under the Leases. (Seery Aff. Exs. 4–6 at ¶ 6.) The latter two Leases were executed on Octo-

ber 15, 1999, and February 15, 2000, between Wells Fargo and TACA. (Seery Aff. Ex. 10, 11.) All five of the Leases are essentially identical with the exception of the specific aircraft rented and the operative dates of each individual Lease.

3. A "hell or high water" lease is a lease where, by its terms, payment is due under any circumstance. See, e.g., Rhythm & Hues v. Terminal Marketing Co., 2002 WL 1343759 at *5 (S.D.N.Y. June 19, 2002).

(Seery Aff., Exs. 1–3, 10, 11 at § 7.5.)[4]

The Leases also contain an express disclaimer of representations and warranties, which states in relevant part:

The aircraft is to be leased hereunder "as is, where is." Except as expressly provided in this agreement, the lessor ... specifically disclaims any representation or warranty, express or implied, as to the airworthiness, load carrying capability, value, durability, compliance with specifications, condition, design, operation, merchantability, freedom from claims of infringement or the like, or fitness for use for a particular purpose of the aircraft or as to the quality of the material or workmanship of the aircraft, the absence therefrom of latent or other defects, whether or not discoverable, or as to any other representation or warranty whatsoever, express or implied ... with respect to the aircraft ....

(Seery Aff., Ex. 1–3, 10, 11 at § 14.)

Finally, each Lease Agreements also contains an integration clause which reads:

This Lease is intended to be a complete and exclusive statement of the terms of the agreement of the parties hereto and this Lease supersedes any prior or contemporaneous agreements, whether oral or in writing in relation to the leasing of the Aircraft to the Lessee. Neither this Lease nor any term of this Lease may be modified or waived except in writing signed by the parties.

(Seery Aff., Ex. 1–3, 10, 11 at § 29.7.)

Defendants claim that at some point after assuming the Leases,[5] they realized that the true operating costs of the aircraft exceeded $2000 per block hour[6] while the maintenance estimates represented by C–S Aviation were between $1160 and $1355 per block hour (Countercl. at ¶¶ 10, 13, 36), Defendants allege that at a meeting on December 11, 2000, C–S Aviation revealed for the first time that its maintenance cost figures were based on engine overhauls done by Air India in India. (Bloch Aff. at ¶¶ 29, 31.) Shortly after this meeting, TACA informed C–S Aviation that it wanted to terminate all five of the Leases, but instead of doing so, it agreed to C–S Aviation's proposal that they "work together" to terminate the Leases by finding other airlines to take over the aircraft. (Bloch Aff. at ¶¶ 31–34; Exs. H, L.) These discussions eventually resulted in the signing of a letter agreement ("Letter Agreement"), which modified TACA's rent payment obligations.

The Letter Agreement, signed on June 21, 2001, by TACA and C–S Aviation as Wells Fargo's "appointed aircraft manager," amends the payment plan under the

---

4. This section of the agreement, and the disclaimer of warranties quoted in the next paragraph, are among the approximately half-dozen provisions of the 87–page lease agreements and over 200 pages of attached schedules and exhibits that are printed entirely in capital letters. To facilitate reading, we do not reproduce this orthography.

5. It is unclear from the counterclaim precisely when this realization occurred, but the implication is that TACA discovered this fact sometime between assuming the first of the leases in November 1998 and discussing the problem with C–S Aviation in December 2000.

6. A "block hour" refers to the period of time measured in hours from the moment a jet bridge is removed from an aircraft at departure to the moment the jet bridge is placed back on the aircraft at arrival, or, if there is no jet bridge, from the moment an aircraft initiates push back until the brakes are finally applied at the destination. (Nagin Decl. at ¶ 14.) The airline industry apparently measures the expense of maintaining aircraft, a significant operational expense, in terms of maintenance costs per block hour.

Leases reducing the Defendants' near-term obligations for four of the five aircraft. (Seery Aff. ¶¶ 19–20, Ex. 15, Ex 15; Answer ¶ 21.) The Letter Agreement sets a revised monthly rent for each aircraft, requires that TACA will make up for the shortfall between the revised 2001 payment schedule and the original payment schedule by increased monthly rental payments to begin in January 2002, provides that "each of the lease agreements in respect of the Aircraft ... remain in full force and effect without modification or amendment," and states that all reasonable documented legal fees resulting from the default of timely payment of outstanding rents shall be paid by TACA. (Seery Aff. Ex. 15 at ¶ 1(c), ¶ 6.) The Letter Agreement also contains a clause "reserv[ing] the right to continue working towards a solution which would allow TACA to terminate the leases ... in a manner and pursuant to conditions acceptable to C–S Aviation Services and its lenders." (*Id.*)

After attempts to find a substitute lessee failed, TACA ceased operating the aircraft in October 2001, and stopped paying the monthly rent on four of the aircraft as of October 2001 and on the fifth aircraft as of November 2001. (Compl.¶ 31, Answer, ¶ 31.) TACA returned four of the five planes in January 2002, and made the fifth aircraft, which was not authorized to fly due to a structural flaw, available to the Lessors in El Salvador. (Bloch Aff. at ¶¶ 62–63.) [7]

## DISCUSSION

### I. *The Parties' Contentions*

Wells Fargo alleges that Defendants breached their obligations under the Leases by failing to pay the rent due, and moves for partial summary judgment on its breach of contract claims, for presently ascertainable damages of $2,996,972.29 on the Leases and $76,211.49 in attorney's fees plus applicable interest,[8] as of the date of filing this action. Wells Fargo claims that the express terms of the Leases make TACA's obligation to pay unconditional, and the defenses and counterclaims raised by Defendants neither justify nonpayment nor raise genuine issues of material fact. (Pl.'s Mem. for Partial Summ. J. at 2.)

■ TACA and JHM Cargo respond with four counterclaims, which they maintain also operate as defenses to and set-offs against their alleged obligations to pay rent. Specifically, they claim the Leases should be rescinded under theories of (1) fraudulent inducement (2) fraudulent misrepresentation (3) negligent misrepresentation and (4) violation of New York's consumer protection law, New York General Business Law § 349.[9] (Nagin Aff. Ex. 2

---

7. The instant litigation gained transnational complexity when, on November 19, 2001, Defendants TACA and JHM Cargo filed an action relating to the issues in this case in the Civil Court for the District of Zacatecoluca in El Salvador. On June 24, 2002, this Court denied a motion by Wells Fargo to enjoin Defendants from proceeding with the El Salvador action and also denied Defendants' motion to stay Plaintiff's complaint before this Court until the Salvadoran action was resolved.

8. Wells Fargo also requests that the Court grant it leave to seek additional damages for the time postdating the filing of this action.

9. The Leases contain a choice of law clause specifying that issues arising under the Leases are governed by the law of New York. (Exs. 1, 2, 3, 10, 11 at ¶ 29.9.) As neither party raises any issue as to the validity or scope of this provision, and as both parties exclusively cite New York law in discussing the counterclaims, the parties have clearly consented to the application of New York law to these particular claims. *See, e.g., Golden Pacific*

¶¶ 65–96.) Defendants allege the same claims against C–S Aviation, in their Third–Party Complaint, except that the fraudulent inducement claim is replaced by a civil RICO claim.

The gravamen of the first three defenses/counterclaims is that C–S Aviation, acting as an agent for Wells Fargo,[10] misrepresented the historical maintenance costs for the aircraft to be significantly lower than they actually were—a matter that Defendants claim is critical to the profitability of operating the aircraft and, further, was known by C–S to be critical to Defendants' decision to enter the Leases—thus luring TACA, which relied on these representations, into the Leases. They also claim that whether or not the Leases contain hell or high water provisions is immaterial, as the Leases were modified by the Letter Agreement, which obliged Lessors to "work with Lessees and consider in good faith proposals for terminating the leases." (Defs.' Mem. Opp. Partial Summ.

J. at 13.) In the alternative, Defendants argue that "the 'hell or high water' provisions and general disclaimers are rife with ambiguities" and, as such, summary judgment should not be granted. (Id. at 23–24.)[11] Hence, Defendants claim, not only can the Leases not be enforced against them, notwithstanding the disclaimer provision or the hell and high water clause, but they, in fact, are entitled to damages of $65,000,000 from Wells Fargo and/or C–S Aviation, because of the costs resulting from the misrepresentations made to them by C–S Aviation.

Wells Fargo and C–S Aviation move to dismiss these claims, maintaining that the Leases were specifically designed to defeat exactly these kinds of allegations, in at least two respects. First, the hell or high water clause in the Leases requires Defendants to pay rent regardless of any defenses or set-offs. Under this clause, even if Defendants were ultimately able to establish at trial that they are entitled

---

Bancorp v. FDIC, 273 F.3d 509, 514 n. 4 (2d Cir.2001).

**10.** Defendants maintain that "at all times, C–S was acting on behalf of Lessors" as an "authorized agent" of Wells Fargo, since C–S Aviation set up the various trusts, designated Wells Fargo to act as owner trustee for the aircraft Leases, acted as the sole negotiator and exclusive managing company for the Leases, represented Wells Fargo in negotiations for resolving the termination of the Leases, and signed the Letter Agreement on behalf of Wells Fargo. (Defs. Mem. at 12; Seery Aff. Ex. 15 at 3; Countercl. ¶¶ 11, 60)

Wells Fargo does not dispute that C–S Aviation is its agent for the Leases in question. Indeed, Wells Fargo seeks rent under the Letter Agreement, which was signed only by TACA and C–S Aviation. As Wells–Fargo considered C–S Aviation capable of modifying the Leases by the Letter Agreement and now seeks rent under that Agreement, Wells–Fargo has ratified the modified contracts and there is no reason to doubt C–S Aviation's role as an agent for Wells Fargo.

A third party generally has no action against an agent in a disclosed principal situation because the contract is with the principal. Citibank v. Nyland Ltd., 878 F.2d 620, 624 (2d Cir.1989) (citations omitted). However, a principal is liable for an agent's fraud although the agent acts solely to benefit himself if the agent acts with apparent authority. Id. (citation omitted). Thus, as the Leases in question are held by Wells Fargo and an agency relationship exists, Wells Fargo will be held to answer for any fraud or misrepresentation relating to the Leases on the part of C–S Aviation. In effect, C–S Aviation and Wells Fargo stand in each other's shoes for purposes of these claims.

**11.** Although Defendants make this claim about both the hell or high water and disclaimer clauses, they fail to present any argument that the hell or high water clause is unclear. Their only express analysis of potential ambiguities concerns whether the disclaimer clause encompasses representations concerning the maintenance costs of the aircraft. Thus the ambiguity argument will be considered only as to the disclaimer clause.

to some recovery against Wells Fargo and/or C–S Aviation, that would not defeat Defendants' obligation to pay rent pending any such adjudication. Second, the Leases specifically disclaim any and all representations, promises and warranties of the sort that Defendants now say they relied on, and thus, as a matter of law, reasonable reliance (an essential element of Defendants' fraudulent inducement, misrepresentation, and civil RICO claims) is precluded.[12] In addition, Wells Fargo and C–S Aviation argue that Defendants' fraud claims fail to satisfy the requirement of Fed.R.Civ.P. 9(b) that fraud be plead with particularity, and that Defendants' claim for violation of Section 349 of the New York General Business Law fails to state a claim.

For the reasons that follow, Wells Fargo's motion for partial summary judgment, its motion to dismiss Defendants' counterclaims, and C–S Aviation's motion to dismiss the Third–Party Complaint will be granted.

II.  *Motion for Partial Summary Judgment*

A.  *Summary Judgment Standard*

When adjudicating a motion for summary judgment, a court must resolve all ambiguities in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in

the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the opposing party " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505).

While Rule 56 permits a party to move for summary judgment "at any time," Fed.

---

12. Wells Fargo and C–S Aviation also argue that the Defendants fail to allege actual misrepresentations, since they do not allege that the historical maintenance costs were other than what C–S Aviation represented, or that Wells Fargo promised that Defendants would or could experience the same maintenance costs during the term of the Leases. (Pl.'s Mem. at 11; Third–Party Def.'s Mem. at 9.)

Wells Fargo and C–S Aviation concede that Defendants may have alleged a misrepresentation of the "good mechanical condition" of the aircraft (Compl.¶ 13) but claim that, as to that representation, Defendants could not justifiably rely on representations of the planes' condition given the terms of the disclaimer. (Pl.'s Mem. for Motion to Dismiss at 11.)

R.Civ.P. 56(b), pre-discovery summary judgment is the exception rather than the rule and will be granted "only in the clearest of cases." *Kleinman v. Vincent,* 1991 WL 2804 *1 (S.D.N.Y. Jan.8, 1991); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (summary judgment typically granted only after adequate time for discovery); Moore's Federal Practice, ¶ 56.15[5] at 56–308 n. 28 (1993 & Supp.1994). Under Fed. R.Civ.P. 56(f), summary judgment "may be inappropriate where the party opposing it shows ... that he cannot at the time present facts essential to justify his opposition." *See Liberty Lobby,* 477 U.S. at 250 n. 5, 106 S.Ct. 2505. What time will be adequate may vary, however, and where it is clear that the defendant cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery. *See Gottlieb v. County of Orange,* 84 F.3d 511, 519 (2d Cir.1996).

■ The Court must consider several factors in determining whether to grant summary judgment in the absence of discovery: (1) whether the lack of discovery was in any way due to fault or delay on the part of the nonmovant; (2) whether the nonmovant filed a sufficient Rule 56(f) affidavit explaining: (i) what facts are sought and how they are to be obtained, (ii) how those facts are reasonably expected to create a genuine issue of material fact, (iii) what effort the affiant has made to obtain them, and (iv) why the affiant was unsuccessful in those efforts; and (3) whether the nonmovant provided any basis for its belief that further discovery would alter the outcome of the summary judgment

motion. *See Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996); *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995).

■ Here, the absence of discovery does not present an obstacle to the granting of partial summary judgment on liability. None of the above factors apply here as the relevant terms of the Leases are not in controversy. What is in dispute, rather, are the legal inferences to be drawn from undisputed terms to determine the validity, meaning and scope of the two agreements: the Leases and the Letter Agreement. In addition, given the explicit integration clause in the Leases (Seery Aff., Ex. 1–3, 10, 11 at § 29.7), no parol evidence, which could require fact discovery, should be considered in interpreting the Leases.[13] At any rate, Defendants have not filed a Rule 56(f) affidavit or otherwise claimed that they lack adequate information to oppose the motion, and thus have waived any claim that adjudication of Plaintiff's motion should await further discovery.

### B. *Hell or High Water Clause*

As noted above, the Leases in question each include a provision that states:

> The Lessee's obligation to pay all rent and all other amounts due hereunder and to perform all the terms hereof shall be absolute and unconditional and shall not be affected or reduced by any circumstances, including (I) any set-off, counterclaim, recoupment, defense or other right which the lessee may have against the lessor ....

---

**13.** The parol evidence rule generally prohibits the introduction of extrinsic evidence to interpret an otherwise unambiguous contract. Only recently the Second Circuit has held that it is "well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract." *Omni Quartz v. CVS,* 287 F.3d 61, 64 (2d Cir.2002) (citing *Seiden Assocs. v. ANC Holdings,* 959 F.2d 425, 428 (2d Cir.1992)).

(Seery Aff., Exs. 1–3, 10, 11 at § 7.5.) [14]

New York law holds as a basic tenet the "eminently sensible proposition" that when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. *Refinemet Int'l Co. v. Eastbourne N.V.*, 25 F.3d 105, 108 (2d Cir.1994) (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)). For the purposes of a summary judgment motion, the Court must decide whether significant contractual ambiguity exists. *Echelon Int'l Corp. v. America West Airlines*, 85 F.Supp.2d 313, 317 (S.D.N.Y.2000) (citing *Giles v. City of New York*, 41 F.Supp.2d 308, 318 (S.D.N.Y.1999)). If the language of the contract is "unambiguous and conveys a definite meaning," then the interpretation of the contract is a question of law for the court. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir.1995) (citations omitted). If the terms are not clear, the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent is admissible. *Id.* Further, a court may not draw any inference or give any construction to the terms of a written contract that may conflict with the clearly expressed language of the written agreement. *See, e.g.*, *General Elec. v. Compagnie Euralair*, 945 F.Supp. 527, 529 (S.D.N.Y.1996) (citation omitted).

■ As a general rule, leases containing hell or high water clauses are enforceable even in the face of defaults by the party seeking to enforce them. *See, e.g.*, *Window Headquarters v. MAI Basic Four*, 1994 WL 673519 at *12 (S.D.N.Y. Dec.1, 1994) (finding hell or high water clauses customary and routinely enforced in computer rental industry); *Netrix Leasing v. K.S. Telecom*, 2001 WL 228362 at *5 (S.D.N.Y. Mar.7, 2001) (upholding hell or high water clause in third-party finance lease for telephone network equipment); *Siemens Credit Corp. v. American Transit Ins.*, 2001 WL 40775 at *1–2 (S.D.N.Y. Jan.17, 2001) (upholding hell or high water clause in finance lease and directing summary judgment for plaintiff); *Rhythm & Hues v. Terminal Marketing Co.*, 2002 WL 1343759 at *5 (S.D.N.Y. June 19, 2002) (stating hell or high water leases are generally enforceable). *See also* R. Contino, Legal and Financial Aspects of Equipment Leasing Transactions 29, 87–88 (1979) (finance leases containing hell or high water clauses are strictly enforced).

■ The terms of the instant provision could not be clearer. The obligation to pay rent is "absolute and unconditional and shall not be affected or reduced by any circumstances, including … any set-off, counterclaim, recoupment, defense or other right." The provision is supported by a specific disclaimer provision, discussed below, as well as an explicit merger clause, and there are no terms within the Leases that appear to conflict with this unambiguous obligation to pay rent. Therefore, under the clear terms of the Leases, the Court finds that the undisputed material facts establish that Defendants have not fulfilled their obligation to pay the rent due.

Defendants' failure to comply with the unambiguous terms of the contract accordingly requires partial summary judgment for Plaintiff unless the original contractual provisions have been materially modified by the Letter Agreement.

**14.** As also noted above, the parties apparently attached particular importance to this clause, as it among the handful of provisions in the lengthy contract printed entirely in uppercase type. See note 4 above.

## C. *The Letter Agreement*

██ Defendants maintain that even if the clauses in the original Leases are found to require Defendants to pay rent, these terms no longer apply, because the Leases were modified by the June 21, 2001, Letter Agreement in such a way as to preclude summary judgment for the rent due under the Leases.[15]

As stated above, the Letter Agreement allows for reduced rent payments in the near-term and provides a modified partially-deferred rent-payment schedule. (Letter Agreement, Schedule 1.) The Letter Agreement also provides:

We acknowledge and understand the concerns expressed in paragraphs 4 of your letters of June 15, 2001 and June 18, 2001 concerning eventual arrangements in respect of the Aircraft and the MSN 142 Aircraft. We reserve the right to continue working towards a solution which would allow TACA to terminate the leases ... in a manner and pursuant to conditions acceptable to C–S Aviation Services and its lenders and we respectfully request that you consider in good faith any proposal made for such purposes.

(Seery Aff. Ex. 15 at 2)

TACA and JHM Cargo claim that evidence submitted by Federico Bloch, TACA's Chief Executive Officer, demonstrates "that C–S, and Lessors breached the June 21, 2001 Letter Agreement on June 28, 2001, by categorically refusing to consider in good faith any proposal from Lessee that involved terminating Lessees' status as lessee under the Aircraft Leases." (Defs.' Mem. Opp. Partial SJ at 12,

citing Bloch Aff. at ¶ 32–34, 41 and 45.) As a consequence, they claim, they are relieved of their obligation to pay rent.

This argument is unavailing. The Letter Agreement is clear that "except as expressly modified ... each of the lease agreements ... remain[s] in full force and effect without modification or amendment." (Bloch Aff. Ex. V, ¶ 6.) Nothing in the Letter Agreement suggests a waiver of rights or rescission of the original Leases except as to those issues specifically covered in the Letter Agreement. Although the Letter Agreement defers certain specific rent payments that would otherwise have been due from Defendants, nothing in it remotely indicates a modification of the hell or high water provisions of the original contracts, or cancels Wells Fargo's absolute right to collect the rescheduled rent payments. The fact that Wells Fargo agreed to accommodate Defendants by deferring certain payments, subject to the payment of interest and compliance with a modified payment schedule, does not abrogate any other provision of the Leases.

Nor does Wells Fargo's agreement to consider the feasibility of substituting a new lessee for the financially-strapped TACA mean that if no suitable replacement was found, Wells Fargo has forfeited its rights under the Leases. The Letter Agreement obliges Wells Fargo only "to consider in good faith any proposal" for terminating the Leases. This language places no obligation on C–S Aviation or Wells Fargo to find an alternate lessee or accept any lessee proposed by Defendants, or indeed to do anything other than consider options presented to it by Lessees.[16]

---

**15.** Wells Fargo concedes that the Letter Agreement is a valid modification of the original Leases, indeed basing its own calculation of TACA's unpaid rent obligations on the June 21, 2001, modifications. (Pl.'s Mem. for Partial Summ. J. at 16).

**16.** This clear interpretation is further supported by a June 28, 2001, email sent from Jim Walsh to Federico Bloch, which explicitly states "the basis for the June 21 agreement ... was that TACA would continue to pay currently, according to the schedule outlined

Defendants attempt to circumvent this plain language of the Letter Agreement by arguing that Wells Fargo's denial of an obligation to assist TACA in terminating the Leases was, in itself, a breach of the Agreement. (Defs.' Mem. Opp. Partial Summ. J. at 13; Bloch Aff. at ¶ 55.) But there is simply no language in the Letter Agreement requiring the Lessor to assist the Lessees in terminating the Leases.

Nor is there any evidence in the current record to suggest that TACA proposed any substitute lessees, or made any proposal to terminate the leases, much less that any such proposal was not considered in good faith by Lessors. Defendants' proffered evidence tends to show that C–S Aviation represented to TACA that it was attempting to assist them in finding others to take over the Leases at issue either by sale, sublease, or direct lease (Bloch Aff. Exs. G, H, M, P) and that Wells Fargo accepted less than full payment (Seery Aff. Ex. 15 at 1). However, neither Wells Fargo's waiver of its right to full payment and agreement to accommodate Defendants by accepting less than the rent due, nor its agreement to help find a substitute lessee, entails that if those effort fail, Plaintiff has then lost the rights it would have had under the Leases. To draw such a conclusion would be inconsistent with the language of the Letter Agreement, and would attribute illogical motivations to Wells Fargo. To impose such an interpretation as a legal norm would give parties to contracts a perverse incentive not to accommodate debtors on any matter, lest they lose all that they had originally bargained for.

Accordingly, as the material terms of the Letter Agreement were not breached by Wells Fargo or C–S Aviation, and were indisputably breached by Defendants, the Leases continue to require payment of

in the agreement ... until the leases were terminated 'in a manner and pursuant to con-

rent by Defendants. Plaintiff's motion for partial summary judgment is therefore granted.

III. *Motion to Dismiss Defendants' Counterclaims and Third–Party Claims*

A. *Motion to Dismiss Standard*

A motion to dismiss counterclaims is governed by Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court must liberally construe the claim, accepting as true the facts alleged, and dismiss the counterclaims only if it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lerman v. Bd. of Elections of New York*, 232 F.3d 135, 140 (2d Cir. 2000). The court is not, however, required to accept as true "conclusions of law or unwarranted deductions." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.1994) (citations omitted). Moreover, in deciding a motion to dismiss, a court may consult the text of documents incorporated by reference or otherwise relied on in the complaint. *Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir.1995); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993).

B. *Fraud and Misrepresentation Claims*

Defendants assert several closely-related fraud claims as counterclaims against Wells Fargo or as third-party claims against C–S Aviation. Though the particular elements of these various claims differ in certain respects, and Defendants' claims survive several arguments made by Wells Fargo and C–S Aviation, all of the claims alike ultimately fail for the same reason. Each of Defendants' fraud theories re-

ditions acceptable to C–S Aviation Services and its lenders.' " (Bloch Aff. Ex.W.)

quires reasonable reliance on the asserted representations or omissions. Defendants, having expressly disclaimed in the text of the Leases any reliance on precisely the kinds of misstatements they now claim were made to them, cannot as a matter of law establish that they reasonably relied. Accordingly, their claims for fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and civil RICO violations must all be dismissed.

### (1) *Fraudulent Inducement and Fraudulent Misrepresentation*

■ To state a claim for fraud a plaintiff must demonstrate (1) representation of a material fact (2) falsity (3) scienter (4) reasonable reliance and (5) injury. *Manning v. Utilities Mut. Ins. Co., Inc.,* 254 F.3d 387, 400 (2d Cir.2001). Thus, to plead either fraudulent misrepresentation or fraudulent inducement, Defendants must allege that they reasonably relied on false representations made by Wells Fargo or C–S Aviation. *See, e.g., Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d 479, 490 (2d Cir.1998) (New York law requires same elements for fraudulent misrepresentation and fraudulent inducement) (citing *Turtur v. Rothschild Registry Int'l,* 26 F.3d 304, 310 (2d Cir.1994) (enumerating elements of common law fraud under New York law); *Village of Chatham v. Board of Fire Comm'rs,* 90 A.D.2d 860, 456 N.Y.S.2d 494, 495 (3d Dep't 1982) (same for fraudulent misrepresentation); *Stone v. Schulz,* 231 A.D.2d 707, 647 N.Y.S.2d 822, 823 (2d Dep't 1996) (same for fraudulent inducement); *Pinney v. Beckwith,* 202 A.D.2d 767, 608 N.Y.S.2d 738, 739 (3d Dep't 1994) (same)).

(a) As an initial matter, the Court rejects Wells Fargo's and C–S Aviation's argument that Defendants have failed to plead fraud with sufficient specificity to satisfy Fed. R. Civ P. 9(b). Under Rule 9(b), a plaintiff alleging fraud must state "the circumstances constituting fraud ... with particularity." This exception to the generally liberal standard of pleading helps to ensure that defendants receive fair notice of allegations of fraud and to protect them from the harm to reputation or goodwill that can result from such allegations. Since "[i]t is a serious matter to charge a person with fraud," a plaintiff is not permitted to do so "unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically." *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972). *See DiVittorio v. Equidyne Extractive Industries,* 822 F.2d 1242, 1247 (2d Cir.1987). Accordingly, except as to "matters peculiarly within the opposing party's knowledge" for which the allegations of fraud must be accompanied by "a statement of the facts upon which the belief is founded"—"[a]llegations of fraud cannot ordinarily be based 'upon information and belief.' " *Luce v. Edelstein,* 802 F.2d 49, 54 & n. 1 (2d Cir.1986) (internal quotation marks and citations omitted).

Instead, the complaint must specify the "particulars" of the alleged fraud—including, for example, the time, place, particular individuals involved, and specific conduct at issue. *Id.* at 54. And while Fed. R.Civ.P. 9(b) provides that "malice, intent, knowledge, or other condition of mind ... may be averred generally," this standard for allegations concerning state of mind does not give "license to base claims of fraud on speculation and conclusory allegations." *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks and citations omitted). The plaintiff still must allege facts giving rise to a "strong inference of fraudulent intent," which may be satisfied "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence

of conscious misbehavior or recklessness." *Id.* However, a generalized profit motive that could be imputed to any for-profit company, is insufficient for purposes of inferring scienter. *Chill v. General Electric Co.,* 101 F.3d 263, 268 (2d Cir.1996).

Although the question is close, Defendants adequately allege fraud under Rule 9(b). The third-party complaint provides notice to C–S Aviation of the nature of the alleged fraud, which satisfies the core purpose of the Rule 9(b). *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Defendants state, in their Third–Party Complaint, that a specific individual at C–S Aviation, one Andrew Toutt, Vice President of Technical Services, misled another named individual, Roberto Escalante, of JHM Cargo, when, beginning in January 1998, Toutt represented to Escalante maintenance costs for the aircraft of between $1160 and $1355 per block hour, but did not reveal that these costs were based on maintenance done in India, although Toutt knew that the costs of maintaining the aircraft elsewhere were higher; that TACA and JHM Cargo relied on these representations; and that C–S Aviation knew that maintenance costs were a significant matter to Defendants. (Third–Party Compl. at ¶¶ 9–11, 13–16, 24, 36, 39, 40, 44, 50, 53–57, 63, 94.)

(b) The argument that Defendants did not adequately plead fraud because they did not allege knowing misrepresentation of a material fact is equally unavailing. (Pl.'s Mem. for Mot. to Dismiss at 11.) In its counterclaims, TACA specifically alleges that C–S Aviation, acting as an agent for Wells Fargo, provided false or misleading information about the maintenance costs, a subject that they claim C–S Aviation both knew was crucial to their decision to lease the aircraft in order to induce TACA and JHM Cargo to sign the Leases. (Countercl.¶¶ 10, 11, 15, 16, 26, 30–34, 37–39, 50, 52, 73, 75.) TACA further claims that C–S Aviation knew that "JHM lacked expertise ... [and] would have to look to C–S for truthful, accurate, and complete information" in making their decision. (Countercl.¶ 14.)

It is not clear whether Defendants mean to allege that the historical maintenance costs reported by C–S Aviation were literally false. (*Compare* Defs.' Mem. Opp. Mot. to Dismiss at 6–7 *with* Pl.'s Mem. for Mot. to Dismiss at 11–12; Tr. at 10–15.) While Defendants do state that the "initial representations" and "continuing representations," both of which include references to the historical maintenance costs for the aircraft reported by C–S Aviation, were "false," they appear to be arguing not that the representations were literally false statements of what the maintenance costs had been, but rather that they were misleading because C–S Aviation knew or should have known that the historical costs were only relevant insofar as they could be used to project future maintenance costs. Defendants claim that the represented historical costs were low only because engine overhaul work had been performed in India, where costs are unusually low, and that C–S Aviation knew or should have known that TACA would not be able to service the planes there due to lax maintenance standards, which would not meet regulatory obligations in the Western hemisphere. (Countercl. ¶ 45–48; Compl. ¶¶ 11, 44.)[17] These allegations suffice to

---

17. Defendants' briefs could be read to suggest a claim that the representations as to maintenance were also misleading in that C–S Aviation used historical costs for maintaining the planes for passenger transportation rather than for freight operation. (Defs.' Mem. Opp. Mot. to Dismiss at 6.) Such a claim is not clearly alleged in the counterclaim or third-party complaint, and it appears that both parties to the negotiation were aware that the

meet the requirement of pleading knowing misrepresentation of a material fact for the fraud claims.

As reasonable reliance is a required element of all of Defendants' fraud and misrepresentation claims, it will be discussed below.

### (2) Negligent Misrepresentation

■ To state a claim for negligent misrepresentation under New York law, a plaintiff must establish that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *Hydro Investors v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.2000). The alleged misrepresentation must also be factual in nature and not promissory or relating to future events that might never come to fruition. *Id.* (citing *Murray v. Xerox Corp.*, 811 F.2d 118, 123 (2d Cir. 1987)).

■ Plaintiff argues that Defendants' negligent misrepresentation claims must fail because Defendants have not adequately pleaded a special relationship between the parties to the Leases. The special relationship component of a negligent misrepresentation claim was discussed in *Kimmell v. Schaefer*, 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450 (N.Y.1996). In *Kimmell*, the Court of Appeals held that whether a special relationship exists between two parties is an issue

of fact, to be governed by weighing three factors: whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose. 89 N.Y.2d at 257, 652 N.Y.S.2d 715, 675 N.E.2d 450; *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir.2001) (citing *Kimmell*).

The relationship between unaffiliated business entities negotiating a commercial aircraft lease would seem an unlikely candidate for being considered such a special relationship. While C–S Aviation could be found to have special expertise in aviation matters, its counterparties here are themselves specialized aviation companies. Nor do Defendants plead that the parties had any prior dealings that would have created any relationship of particular trust and confidence between them. Nevertheless, Defendants' counterclaim can be read to allege a relationship between the parties that extended beyond the typical arm's-length business transaction. TACA claims that C–S Aviation, acting as Wells Fargo's agent, made expert representations about maintenance costs and that C–S Aviation was aware that TACA would rely on those representations. Moreover, TACA asserts that C–S Aviation had unique expertise in the intended conversion of Airbus 300 aircraft from passenger to cargo use. TACA also maintains that C–S Aviation made representations to JHM Cargo's President Roberto Escalante regarding the historical maintenance costs of the aircraft knowing that JHM Cargo would rely on C–S Aviation's asserted expertise to make their de-

---

aircraft in fact had only been used in the past for passenger operation, and were to be con-

verted by TACA to cargo use.

cisions on Leases. (Countercl.¶¶ 10, 13, 15.) It is also alleged that Andy Toutt, who became C–S Aviation's Vice President of Technical Services, as well as "other agents of C–S" misrepresented the historical maintenance costs and the good mechanical condition of the planes to JHM Cargo as well as to TACA (although those who received this information within JHM Cargo or TACA are not named). (Countercl.¶ 13.) Since the determination of whether a special relationship exists is essentially a factual inquiry, we will assume for present purposes that these somewhat sparse allegations suffice, at least at the pleading stage, to survive a motion to dismiss.

Once again, however, the reasonable reliance element, discussed below, is fatal to Defendants' claim.

### (3) *RICO*

In their Third–Party Complaint, Defendants claim that C–S Aviation's alleged misrepresentations violated the RICO statute, 18 U.S.C. § 1962(c). In support of their civil RICO claim, Defendants allege:

> Beginning at least in January 1998, C–S committed multiple acts of mail and wire fraud by using facsimile machines, email accounts and the United States Postal Service facilities to deliver documents to TACA and JHM that were false and misleading including, but not limited to: (1) comparative performance models for the A300 Aircraft and DC8 Aircraft; (2) profitability analyses for Aircraft operations that include maintenance costs provided by C–S; (3) documents containing representations of maintenance costs for the Aircraft; (4) "Fact Sheets" with vital information concerning the Aircraft including maintenance programs and conversion status reports; and (5) charts that included information on maintenance reserves. In addition, agents, employees, and representatives of C–S including, but not limited to, Andy Toutt repeatedly used telephone services in the United States to communicate the above-referenced and additional false, misleading, and fraudulent information to TACA and JHM.

(Third–Party Compl. ¶ 94.) The false and misleading statements alleged effectively hinge on the same alleged misrepresentations discussed above concerning the maintenance costs associated with the aircraft.

The RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), and authorizes civil suits by any person injured in his person or property by such a violation, 18 U.S.C. § 1964(c). To establish a claim for a civil violation of § 1962(c), "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir.1994) (internal quotations omitted). "Racketeering activity" under RICO is defined to include a host of criminal offenses, which are in turn defined by federal and state law. *See* 18 U.S.C. § 1961(1).

Where mail or wire fraud is the RICO predicate act, as Defendants here allege, a plaintiff must show justifiable reliance to establish causation. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992). Thus, Defendants' fraud claims against C–S Aviation under RICO must meet the same standards of justifiable reliance as the various common-law claims discussed above. To that issue we now turn.

#### (4) *Reasonable Reliance*

█ The critical issue for all of the above fraud, RICO and negligent misrepresentation claims is whether, in light of the explicit and broad disclaimers in the Leases between TACA and/or JHM Cargo and Wells Fargo, Defendants can plead the required element of reasonable reliance. Defendants claim that they relied on C–S Aviation's oral misrepresentation of maintenance costs in signing the Leases and that the disclaimer is insufficient as it does not explicitly disclaim representations as to maintenance costs. (Defs.' Mem. Opp. Mot. to Dismiss at 7–11.)

█ It is well-established, however, that a party to a contract cannot rely on oral representations where a contract specifically disavows the incorporation of non-written representations. *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 323, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959). Under New York law if "a party to a contract specifically disclaims reliance upon a representation in a contract, that party cannot … [later] assert that it was fraudulently induced into signing the contract by the very representation it has disclaimed." *Grumman Allied Indus. v. Rohr Indus.*, 748 F.2d 729, 734 (2d Cir.1984), citing Danann. In *Citibank v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), New York extended the *Danann* rule, finding that fraud in the inducement was blocked as a defense, and affirming summary judgment for the plaintiff although the disclaimer in question did not explicitly mention the contested issue, but merely stated that the guarantee at issue

was "absolute and unconditional" irrespective of defenses. *Id.* at 94–95, 495 N.Y.S.2d 309, 485 N.E.2d 974. *See also Harsco Corp. v. Segui*, 91 F.3d 337, 346 (2d Cir.1996) (dismissing fraudulent inducement claim although disclaimer did not specifically disclaim statements about Russian business); *Lucas v. Oxigene, Inc.*, 1995 WL 520752 at *5 (S.D.N.Y. Aug.31, 1995) (parol evidence excluded where plaintiff signed disclaimer containing clause which directly contradicted the alleged oral representations).[18] Further, New York courts have recognized that "no particular words are needed to transform a general disclaimer into a specific one, and have excluded parol evidence even when the contract did not contain an express disavowal of reliance on oral representations." *Lucas*, 1995 WL 520752 at *4. Finally, when applying the *Danann* rule, we are advised that courts should consider the text of the agreement compared to the representations claimed to be fraudulent or negligent, while also considering the arm's-length nature of the negotiation and the sophistication of the parties, in order to determine whether reliance was reasonable. *Harsco*, 91 F.3d at 345.

█ Applying the *Danann* rule, as interpreted by *Plapinger*, it is clear that the exact words "maintenance costs" need not appear in the disclaimer in order for representations about maintenance to have been disclaimed. Defendants are correct that an overly broad disclaimer is insufficient. *Barash v. Pennsylvania Term. Real Estate Corp.*, 26 N.Y.2d 77, 86, 308 N.Y.S.2d 649, 256 N.E.2d 707 (1970). It

---

**18.** Defendants' reliance on *Centronics Fin. v. El Conquistador Hotel*, 573 F.2d 779, 782 (2d Cir.1978), is misplaced. *Centronics* holds that under New York law, a general merger clause alone will not preclude proof by extrinsic evidence of fraud in the inducement. In that case, however, there was no disclaimer of warranties such as the one in this case. *Cen-*

*tronics* itself takes note of the *Danann* rule, which the Second Circuit has since applied in *Harsco*, 91 F.3d at 345–46, holding that where a seller disclaimed representations other than those embodied in the agreement, the disclaimer put the buyer on sufficient notice that oral representations not in the agreement could not be reasonably relied upon.

does not follow, however, that where a written contract specifically identifies areas that are not the subject of representations, a party can avoid its specifically-negotiated contract obligations by claiming a representation that is a slight variant of the particular language disclaimed in the contract.

Here, the disclaimer provision is simultaneously very broad and very particular. In general terms it disavows all representations not expressly made in the contract, but it is not merely a blanket denial. Rather, it specifically lists a variety of significant promises that are explicitly not made, including representations regarding airworthiness, value, durability, compliance with specifications, condition, operation, fitness for use for a particular purpose, quality of material or workmanship, and absence from defects. Although Defendants argue that the definitions of the terms disclaimed are for a jury to decide, the Court finds that maintenance costs are logically an aspect of "condition," "durability," and "operation or fitness for use." If a plane frequently breaks down or is in poor condition, its maintenance costs will obviously go up. It is thus a logical contradiction to expressly disavow any promises about how often a plane will break down, while at the same time promising that the maintenance costs will be a fixed dollar amount each month.

This conclusion is further supported by the plethora of other provisions in the Leases, including that the clause leasing the aircraft "as is, where is," the hell or high-water clause for payment of rent, and the integration clause. *See Mizuna, Ltd. v. Crossland Fed. Sav. Bank,* 90 F.3d 650, 659 (2d Cir.1996) (citation omitted) (oral representations cannot be squared with merger provision which recites that the written contract is the complete expression of the parties' agreement and explicitly disavows oral agreements).

Further, if maintenance costs were as critical to Defendants as they now claim, they were free to negotiate for an express warranty as to that issue in the Leases. In fact, the Leases do include numerous warranties on the part of Wells Fargo for the benefit of Lessees, including, among others things, that they have the authority on behalf of the beneficiary to enter into the Lease, that they have good title to the aircraft, and that the Lease will not violate any provision of U.S. banking laws. (Seery Aff. Exs. 1–3, Ex. 11, Ex. 12 at ¶ 3.2.) Sophisticated business entities, when put on notice of the existence of material facts which have not been documented, assume the business risk that the facts may not be as represented because "a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament." *Lazard Freres & Co. v. Protective Life ⸱Ins.,* 108 F.3d 1531, 1543 (2d Cir.1997). Here, TACA claims that the maintenance costs were critical to its decision to enter the Leases; had the true facts about the maintenance costs been revealed to them, they claim, they would not have leased the aircraft. As aviation companies with extensive experience operating airplanes, Defendants were well aware of the factors that could affect maintenance costs. Nevertheless, they apparently made no effort to investigate the conditions under which the represented historical maintenance costs had been achieved, or to demand any contractual warranties or promises as to either past or future maintenance costs. By not negotiating for a warranty for the maintenance costs, while at the same time broadly disclaiming having received or relied on closely related representations, TACA assumed the business risk that future maintenance costs may not be comparable to the historical costs orally represented to it.

Finally, these agreements, like those in *Plapinger,* are contracts executed by

knowledgeable parties who negotiated at arm's length. 66 N.Y.2d at 95, 495 N.Y.S.2d 309, 485 N.E.2d 974. Although the information provided in TACA's affidavit suggests that TACA may have been relatively less sophisticated in its knowledge of aircraft leasing and maintenance and may have relied upon C–S Aviation's representations in making its decision to enter into the Leases, it is manifestly unreasonable for an airline company to avoid contractual duties by arguing that it is uninformed about the details of its own business.[19]

Defendants maintain, however, that even if the disclaimers in the Leases preclude their fraud claims against Wells Fargo, the terms of the Leases cannot benefit C–S Aviation, which was not a signatory on the Leases. (Defs.' Mem. Opp. Mot. to Dismiss at 7–8.) This argument is unpersuasive. Defendants cannot plead that they reasonably relied on representations from C–S Aviation, Wells Fargo's agent and trust beneficiary, in entering the Leases with Wells Fargo that specifically disclaim having received or relied on precisely such representations. It is irrelevant that C–S Aviation was not a signatory to the contract in which Defendants disclaimed the reliance it now says it placed.

*General Motors v. Villa Marin Chevrolet*, 2000 WL 271965 at *31–32 (E.D.N.Y. Mar.7, 2000), is instructive. In *General Motors*, a sublessor sued a sublessee for unpaid rent. The sublessee, in turn, sued the principal of the entity that owned the leased property, alleging that the principal had induced it to enter the lease agreement through several misrepresentations,

although the principal himself was not a party to the lease agreement. Relying on *Harsco*, 91 F.3d at 345, the court concluded that it is unreasonable, as a matter of law, for a party to claim that it was fraudulently induced to enter into a contract by a prior representation of a third party where reliance was specifically disclaimed in the agreement.

The disclaimer of reliance in the instant case is analogous to *General Motors*. First, Defendants here, like plaintiffs in *General Motors*, claim that the party it charges with fraud may not rely on the disclaimer in the Leases because it was not a signatory to the Leases. Next, the sublease in *General Motors* did not reserve any right to rely on representations made by the principal, just as neither the Leases nor the Letter Agreement contain language preserving any reliance on representations by C–S Aviation. Finally, the close association between Wells Fargo and C–S Aviation makes this an even stronger case than *General Motors* for permitting C–S Aviation to benefit from the disclaimer. Defendants seek to hold Wells Fargo responsible for C–S Aviation's actions under a principal-agent theory; they may not invoke the principal-agent relationship when it suits them and ignore it when it does not. Thus, C–S Aviation, as an agent/beneficiary of Wells Fargo, can equally invoke the terms of the disclaimer in the Leases.

As TACA and JHM Cargo's claim of reasonable reliance is contradicted by the undisputed and unambiguous terms of the contracts they signed, they are foreclosed from raising fraud and misrepresentation as a defense. Accordingly, Wells Fargo's

19. Defendants' reliance on *GTE Automatic Elec. v. Martin's Inc.*, 127 A.D.2d 545, 512 N.Y.S.2d 107 (1st Dep't 1987), is inapposite, as the promissory notes at issue in that case did not contain a specific disclaimer or other language to bar parol evidence of fraudulent misrepresentation, and the court distinguished *Danann* and *Plapinger* on that basis. Here, given the sufficiently specific disclaimer in the Leases, the Danann–Plapinger rule applies.

and C–S Aviation's motion to dismiss TACA and JHM Cargo's claims of fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and civil RICO violations is granted.

### C. New York General Business Law § 349

■ Defendants' final counterclaim maintains that Wells Fargo and C–S Aviation violated New York's consumer protection law, N.Y. Gen. Bus. Law § 349(a), which prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," and which does not require reasonable reliance. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000). Wells Fargo and C–S Aviation argue that TACA and JHM Cargo have not sufficiently alleged a deceptive practice within the meaning of this law and that the dispute at issue is a "quintessential private business dispute," which does not implicate the public interest. (Pl.'s Mem. for Mot. to Dismiss at 23.)

To establish a claim under N.Y. Gen. Bus. Law § 349(a), a plaintiff must, at a minimum, plead and prove that the conduct at issue is consumer-oriented. *Oswego Laborers' Local 214 v. Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). While the outer perimeter of § 349 permits claims for deceptions perpetrated by one business against another business that may affect the public, *see, e.g., Assocs. Capital Servs. Corp. of New Jersey v. Fairway Private Cars*, 590 F.Supp. 10, 14–15 (E.D.N.Y. 1982), federal courts have held that the statute requires the sort of offense to the public interest that would trigger FTC intervention under 15 U.S.C. § 45. *Genes-co Entm't v. Koch*, 593 F.Supp. 743, 752 (S.D.N.Y.1984). In other words, the typical violation contemplated by the statute involves an individual consumer who is misled by a seller of consumer goods, usually by way of false and misleading advertising. *Id.* at 751. The statute's concern with individual consumers is further evidenced by the remedies the statute provides,[20] the derivation of the statute,[21] and the case law, which demonstrates that successful plaintiffs are uniformly those that bring claims involving recurring transactions where the amount in controversy is small, *id.* at 752, and holds that business competitors have standing to rely on the statute only if they can prove that there has been harm to the public at large. *Securitron Magnalock v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995).

Defendants' claims cannot meet this standard. The transaction described in the instant claims is between two businesses, for a limited number of specifically-negotiated transactions for substantial amounts of money. The alleged fraudulent statements attributed to C–S Aviation were not directed at the general public, and indeed concerned matters unique to the maintenance records of the specific aircraft involved in the Leases, and not matters on which the general public could in any way rely. Defendants have alleged only upon "information and belief" that C–S Aviation has made similar deceptive representations regarding maintenance costs to "at least one other potential lessee." (Countercl.¶ 93.) Nor do Defendants allege harm to the consuming public; they merely claim (somewhat dubiously) that C–S's conduct has a *"potentially* significant negative impact upon public safety" (emphasis added). (Countercl.¶ 94.) These few transactions between two busi-

---

**20.** Section 349(h) provides parties with the opportunity to receive the greater of actual damages or $50.

**21.** Section 349(h) is modeled primarily on the Federal Trade Commission Act.

nesses entities, which have not affected the public at large does not suffice to state a claim under New York's consumer protection law.

Accordingly, the motion to dismiss this claim is also granted.

### CONCLUSION

Wells Fargo's motion for partial summary judgment for rent due under the Leases as modified by the June 21, 2001, Letter Agreement is granted. Wells Fargo motion to dismiss Defendants' counterclaims and C–S Aviation's motion to dismiss Defendants' Third–Party Complaint are both granted in full. The Clerk of the Court is respectfully directed to enter judgment accordingly.

SO ORDERED.