**DRUG EMPORIUM, INC., Plaintiff,**

v.

**BLUE CROSS OF WESTERN NEW YORK, INC., Rite Aid Corporation; and Tops Markets, Inc., Defendants.**

No. 99–CV–579C.

United States District Court, W.D. New York.

June 28, 2000.

Akin, Gump, Strauss, Hauer & Feld, LLP, New York, NY (David M. Zensky, Charles E. Biggio, of Counsel), Brown & Kelly, LLP, Buffalo, NY (Rodney O. Personius, of Counsel), for Plaintiff.

Phillips, Lytle, Hitchcock, Blaine & Huber LLP, Buffalo, NY (Jeremiah J. McCarthy, Gary F. Kotaska, of Counsel), for Defendant Blue Cross of Western New York, Inc.

Schnader, Harrison, Segal & Lewis, Philadelphia, PA (Steve D. Shadowen, Barry L. Refsin, of Counsel), Hagerty & Brady, Buffalo, NY (Michael A. Brady, of Counsel), for Defendant Rite Aid Corporation.

Hodgson, Russ, Andrews, Woods & Goodyear LLP, Buffalo, NY (Daniel C. Oliverio, Kevin M. Kearney, of Counsel), for Defendant Tops Markets, Inc.

### *INTRODUCTION*

CURTIN, District Judge.

This case arises from an agreement between defendant Healthnow New York, Inc., d/b/a Blue Cross of Western New York ("Blue Cross"), and defendants Rite Aid Corporation ("Rite Aid") and Tops Markets Corporation ("Tops") to create an exclusive pharmacy network for Blue Cross insureds. Upon learning that its Vix drugstores ("Vix") were excluded from the network, plaintiff Drug Emporium, Inc. ("Drug Emporium") filed the present action, alleging that the exclusive pharma-

cy network violated federal and state antitrust and tort laws.

Currently before this court is defendants' motion to dismiss plaintiff's first four causes of action pursuant to Fed. R.Civ.P. 12(b)(6). Items 17, 33. Plaintiff responds in opposition. Item 36.

## BACKGROUND

For the purposes of this motion, the following facts pled in plaintiff's complaint are deemed true. Defendant Blue Cross is a health insurance company that sells Health Maintenance Organization ("HMO") indemnity and Preferred Provider Organization ("PPO") insurance. Historically, plaintiff Drug Emporium enjoyed a good business relationship with Blue Cross.[1]

Although the contract between Drug Emporium and Blue Cross permitted either party to terminate the relationship on thirty days' written notice, plaintiff claims it reasonably expected that its business relationship with Blue Cross would continue. Item1, ¶ 26. On June 30, 1999, however, Blue Cross exercised its right to terminate its relationship with plaintiff when Blue Cross announced that it was forming an exclusive pharmacy network ("the network") with Rite Aid, Tops, and the independently owned pharmacies in the Western New York region. Previously, Blue Cross insureds with pharmacy benefits received coverage for purchases of prescription drugs at any pharmacy in "the Buffalo area," including plaintiff's Vix drugstores. Item 1, ¶ 17. Under the exclusive pharmacy agreement, Blue Cross's pharmacy coverage would be limited to prescription drugs purchased at Rite Aid, Tops, and independently owned pharmacies. Item 1, ¶ 20.

Shortly after the June 30, 1999 announcement, Blue Cross directed those insureds affected by the network to transfer their prescriptions to Rite Aid or another store within the exclusive network.[2] *Id.* Initially, Blue Cross intended for the network to go into effect on August 1, 1999 with a 30-day grace period; however, the company later decided to delay the effective date of the network until October 1, 1999. Item 1, ¶ 2.

Plaintiff claims that it contacted Blue Cross and expressed a desire to be included in the network but was denied the opportunity to submit a bid regarding the prices of its prescription drugs. Item 1, ¶ 24. Wegman's Pharmacy, however, was allowed to submit a bid and was then added to the network sometime between the announcement of the delay and the filing of this lawsuit. *Id.* ¶ 21.

Plaintiff's complaint filed on August 19, 1999 alleges six causes of action. Count One alleges that the exclusive pharmacy network is a *per se* violation of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. General Business Law § 340, *et seq.* Count Two claims that the network violates the rule of reason. Plaintiff's third claim generally asserts that defendants tortiously interfered with plaintiff's relationships with its customers, while Count Four specifically alleges that Tops and Rite Aid interfered with plaintiff's business relations with defendant Blue Cross.[3]

On August 20, 1999, plaintiff moved for expedited discovery pursuant to Fed. R.Civ.P. 6(a) and Local Rule 7.1(a). Item 2. The court denied this motion on August 31, 1999, and directed plaintiff to file a motion for a preliminary injunction or, in

---

1. Drug Emporium is a Delaware corporation which owns more than 140 drugstores in the United States.

2. Plaintiff concedes in its complaint that it is unsure whether all of Blue Cross's insureds have pharmacy coverage, and thus are subject to the network.

3. Plaintiff's complaint also states two causes of action against Tops for breach of contract and breach of warranty. Those claims, however, are not subject to the present motion to dismiss.

the alternative, to refile its motion for expedited discovery. Item 13.

On September 10, 1999, defendants filed the present motion to dismiss under Fed. R.Civ.P. 12(b)(6). Items 17 and 33. Before the court could consider the motion, on September 17, 1999, plaintiff filed a motion to enjoin the implementation of the exclusive pharmacy network based on plaintiff's tort law claims. Item 22. Oral argument on plaintiff's application for an injunction was heard on September 30, 1999. At the conclusion of oral argument, the court denied plaintiff's motion, holding that plaintiff failed to demonstrate that it was likely to succeed on the merits of its tort law claims. The court then directed plaintiff to respond to defendants' motion to dismiss.

## DISCUSSION

### I. Fed.R.Civ.P. 12(b)(6) Standard

"On a motion to dismiss, the court looks to the four corners of the complaint and is required to accept a plaintiff's allegations as true and to construe those allegations in the light most favorable to plaintiff." *Daniel v. American Bd. of Emergency Medicine*, 988 F.Supp. 112, 118 (Arcara, *J*) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); (*Dacey v. New York Lawyers' Association*, 423 F.2d 188, 191 (2d Cir.1969)). "A dismissal is warranted under Rule 12(b)(6) only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 62–63 (2d Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Notably, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

### A. Antitrust Claims [4]

Dismissals at the pleading stage of an antitrust claim prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly. *Hospital Building Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Nevertheless, conclusory allegations which merely recite the litany of antitrust will not suffice. *John's Insulation, Inc. v. Siska Constr. Co.*, 774 F.Supp. 156, 163 (S.D.N.Y.1991) "This court retains the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* (citing *Assoc. General Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). At a minimum, plaintiff's allegations must cover all the elements that comprise the theory for relief. *Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist.*, 31 F.3d 89, 95 (2d Cir.1994) (citations omitted).

"Section 1 of the Sherman Antitrust Act forbids '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'" *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95 (2d Cir.1998) (quoting 15 U.S.C. § 1 (1994)). Thus, to withstand a motion to dismiss, the plaintiff in a Sherman Antitrust Conspiracy claim must allege (1) a concerted action; (2) by two or more persons; (3) that unreasonably restrains trade either *per se* or under the rule of reason. *See Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 58 F.Supp.2d

---

4. State antitrust claims brought under the Donnelly Act, N.Y.Gen.Bus.Law § 340 (McKinney 1968 & Supp.1987), track the analysis of their companion federal antitrust claims brought under the Sherman Act. *Empire Volkswagen Inc. v. World–Wide Volks-* *wagen Corp.*, 814 F.2d 90, 98 n. 4 (2d Cir. 1987); *see also Kramer v. Pollock–Krasner Found.*, 890 F.Supp. 250, 254 (S.D.N.Y.1995) (the Donnelly Act is modeled on the Sherman Act and is construed in light of federal precedent).

228, 238 (S.D.N.Y.1999); *see also Tops Markets, Inc.,* 142 F.3d at 95–96.

Here, plaintiff's complaint clearly alleges that the network is a form of a concerted action by two or more persons (*i.e.,* defendants Rite Aid, Tops, and Blue Cross). Therefore, at issue is whether the network is either a *per se* violation of the Sherman Antitrust Act or a violation by way of the rule of reason analysis.

### 1. *Per Se* Violations

■ Plaintiff's allegations that the network constitutes a *per se* violation of section 1 of the Sherman Act are without merit. In *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997), the Supreme Court held that "most antitrust claims are analyzed under a 'rule of reason'" and *per se* violations are limited to those restraints that "have such a predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful . . . ." *Id.* at 10, 118 S.Ct. 275. The Court further explained that *per se* treatment is only appropriate " '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" *Id.* (quoting *Arizona v. Maricopa County Medical Soc.,* 457 U.S. 332, 342–43, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)). Consequently, the Supreme Court is reluctant to adopt rules designating " 'restraints imposed in the context of business relationships' " as *per se* violations " 'where the economic impact of certain practices is not immediately obvious.'" *Id.* (quoting *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)).

The Second Circuit has echoed the Court's caution regarding the classification of certain business practices as *per se* violations of section 1. *Capital Imaging Assocs., P.C., v. Mohawk Valley Medical Associates, Inc.,* 996 F.2d 537, 542 (2d Cir. 1993) ("[c]onduct considered illegal *per se* is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination") (internal quotation and citation omitted).

In particular, the Court of Appeals has rejected the application of the *per se* rule to exclusive health provider networks. For example, in *Capital Imaging,* which involved an antitrust lawsuit brought by a private radiology practice against an HMO and the physicians' association with which it had contracted to create an exclusive provider network, the Second Circuit commented that characterizing the application of the *per se* rule to such networks as "futile given . . . the Supreme Court's caution about extension of the *per se* doctrine into new areas" and "the procompetive virtues" of the networks. *Capital Imaging,* 996 F.2d at 545.

Moreover, other courts within the Second Circuit have made similar decisions regarding exclusive provider agreements between an HMO and medical service providers. *See Orthopedics Studio, Inc. v. Health Insurance Plan of Greater New York,* No. 95–4338, 1996 WL 84503 (S.D.N.Y. Feb.9, 1996). As with the *Capital Imaging* case, the facts in *Orthopedics Studio* are analogous to the present action. The plaintiff in *Orthopedics Studio* was a corporation that produced and sold prosthetic devices. It argued that an HMO's decision to enter into exclusive agreements with two other producers of prosthetic devices constituted an illegal *per se* group boycott. The district court disagreed and held that the exclusive arrangement with two of plaintiff's competitors was not illegal *per se,* but instead subject to the rule of reason. *Id.* at *3.

Based on the above, exclusive provider networks such as the one at issue in the present case cannot be considered a *per se* violation under section 1 of the Sherman Act. Thus, plaintiff's *per se* antitrust claim is dismissed.

## 2. Rule of Reason Analysis

The threshold requirement to an antitrust claim brought under the rule of reason is whether the plaintiff has properly alleged an antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). The Second Circuit clearly held in *Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 543 (2d Cir.1993), and subsequent cases, that the antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, " 'that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.' " *See also Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir.1994); *George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir.1998).

▮ Antitrust injury can be shown in one of two ways. First, plaintiff can "plead specific facts demonstrating that the defendants' conduct 'injured the competitive structure of the market.' " *S.O. Textiles Co., Inc. v. A & E Products Group*, 18 F.Supp.2d 232, 243 (E.D.N.Y. 1998) (quoting *Naso v. Park*, 850 F.Supp. 264, 271 (S.D.N.Y.1994)). If a plaintiff is unable to demonstrate such actual effects, "it must at least establish that defendants possess the requisite market power so that their 'arrangement has the potential for genuine adverse effects on competition.' " *Capital Imaging Assoc.*, 996 F.2d at 546 (quotation omitted); *see also K.M.B. Warehouse Distrbs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995).

In the present case, plaintiff's allegations of actual antitrust injury are admittedly prospective in nature, and thus do not sufficiently demonstrate that the network has produced an "actual adverse effect on the relevant market." All involved in this litigation recognize that the speculative nature of the allegations was unavoidable given plaintiff's attempt to obtain expedited discovery and a preliminary

injunction. *See* Item 36 at p. 12. In any event, given the absence of proof regarding the actual effect of the network on drugstores and consumers within Western New York, plaintiff is limited to establishing antitrust injury through allegations that Blue Cross possesses the requisite market power.

▮ "Market power has been defined as 'the ability to raise price significantly above the competitive level without losing all of one's business.' " *K.M.B. Warehouse Distrbs. Inc. v. Walker Mfg. Co.*, 61 F.3d at 129 (quoting *Graphic Prods. Distribs., v. Itek Corp.*, 717 F.2d 1560, 1570 (11th Cir.1983)). It may be shown "by evidence of 'specific conduct indicating the defendant's power to control prices or exclude competition' " or, in the alternative, evidence that defendants possess a significant percent of the market share. *Id.* at 129 (quoting *Broadway Delivery Corp. v. United Parcel Service of America, Inc.*, 651 F.2d 122, 130 (2d Cir.1981)).

Although the Supreme Court has yet to explicitly designate a market percentage threshold for which all claims of antitrust injury must satisfy, the Court has concluded as a matter of law that a defendant with 30 percent of the relevant market share lacked the relevant market power for an antitrust violation. *Jefferson Parish Hosp. District No. 2 v. Hyde*, 466 U.S. 2, 26–27, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Lower courts have rejected even higher market shares between 30 percent and 40 percent as inadequate to demonstrate market power. *See Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F.Supp.2d 694, 708 (D.Minn.1998); *State of New York v. Anheuser–Busch, Inc.*, 811 F.Supp. 848, 873 (E.D.N.Y.1993); *Kuck v. Bensen*, 647 F.Supp. 743, 746 (D.Me.1986).

In the present case, plaintiff alleges that 567,000 out of 1.5 million individuals in the relevant eight-county region of Western New York are insured by Blue Cross. Based on these numbers, plaintiff claims that the network will foreclose it from 37

percent of the market. Compl., ¶ 34. However, absent from plaintiff's antitrust claim is an allegation that all of the 567,000 Blue Cross insureds have a pharmacy benefit that is affected by the network. In fact, plaintiff acknowledges in a later footnote that it is uncertain whether all of Blue Cross's approximately 567,000 insureds will indeed be affected by the network. Compl., ¶ 22 n. 1. As such, plaintiff admits that the allegation in paragraph 34 of the complaint that the network would preclude Drug Emporium from servicing approximately 567,000 people in the Western New York region is not wholly accurate, as the number may be significantly smaller than that.

Further complicating this analysis is the discovery that the network does not in fact affect all of the approximately 567,000 Blue Cross insureds living or working in Western New York. According to the September 9, 1999 letter from Blue Cross attorney Jeremiah McCarthy, as of July 1999, Blue Cross insured a total of 569,301 individuals in Western New York. Only 402,729 of those insureds, however, had pharmacy benefits, and only 320,934 individuals would be restricted to receiving coverage only at the network pharmacies. Based on these numbers, Blue Cross possesses a market share ranging between 21 and 27 percent. *See* Item 41.

What is problematic is that the letter was issued not in support of defendants' motion to dismiss, but rather in response to an inquiry made by the court during the consideration of plaintiff's request for expedited relief. As such, Mr. McCarthy's letter is clearly outside of the pleadings, and reliance on it in deciding the motion to dismiss would violate both the Federal Rules of Civil Procedure and the Second Circuit's holding in *Chandler v. Coughlin*, 763 F.2d 110 (2d Cir.1985).

▮ It is well established that " '[i]f the court considers matters outside of the complaint, it must treat the motion as one for summary judgment and proceed under Fed.R.Civ.P. 56, giving the party opposing the motion notice, an opportunity to submit pertinent material and, if need be, conduct discovery.' " *Thomas v. City of New York*, 143 F.3d 31, 37 (2d Cir.1998) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984)). While some courts have converted a 12(b)(6) motion to one for summary judgment without providing notice and response time to the opposing party, the Second Circuit clearly rejects this practice. *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000) (holding that when matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material). Accordingly, pursuant to decisions in *Thomas* and *Friedl*, defendants' motion to dismiss plaintiff's rule of reason antitrust claim is converted to a motion for partial summary judgment.

### B. Tort Claims

Plaintiff's complaint includes two causes of action which it categorizes as tortious interference with its business relations. First, plaintiff alleges that defendants interfered with Drug Emporium's business relations with Vix customers (Count Three). Second, plaintiff alleges that Tops and Rite Aid interfered with plaintiff's contractual relationship with defendant Blue Cross (Count Four). Item 36, p. 17; *see also*, Compl., ¶¶ 58–62, 64–69.

#### 1. Tort Claims Against All Defendants

Plaintiff alleges in its complaint that by creating the network, defendants tortiously interfered with plaintiff's relationship with its customers. More specifically, plaintiff argues that before the implementation of the network, a business relationship existed between plaintiff and Blue Cross insureds who purchased their phar-

macy products from plaintiff's Vix drug-stores.

�as▮ To state a claim for tortious interference with current or prospective business relations, a plaintiff must allege: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship. *Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000) (citing *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994)). Here, plaintiff's tortious interference claim against defendants fails as plaintiff is unable to establish that a current or prospective business relationship existed between Drug Emporium and the customers of its Vix drugstores.

In *Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922 (1st Cir.1984), the court confronted circumstances nearly identical to those brought before this court by Drug Emporium. The plaintiff in *Kartell* argued that Blue Cross was interfering with a buyer/seller relationship between physicians and their patients when the ·physicians were excluded from Blue Cross's medical provider network. The First Circuit Court of Appeals disagreed, holding that any validity to the buyer/seller characterization "disappears ... once one looks at Blue Shield, not as an inhibitory 'third force' but as itself the purchaser of [healthcare providers'] services." *Id.* at 924.

Although the present case involves drugstores and not physicians, the legal reasoning remains the same. Moreover, outside of the difference between providing pharmaceuticals and providing medical treatment, the facts of the present case are analogous to *Kartell* and other cases involving physicians who were excluded from the provider networks. *See Barry v. Blue Cross of California,* 805 F.2d 866 (9th Cir. 1986); *see also Doctor's Hosp. of Jefferson, Inc. v. Southeast Medical Alliance, Inc.,* 123 F.3d 301, 308 (5th Cir.1997); *Kla-*

math–Lake *Pharmaceutical Ass'n v. Klamath Med. Serv. Bureau,* 701 F.2d 1276, 1292 (9th Cir.1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983); *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 544 (2d Cir.1993).

In each of these cases, the courts held that the drugstores and the physicians provide a medical service to consumers which can be altered based on the actions of health insurance companies in which an individual consumer chooses to enroll. Essentially, the courts in each of the physician cases determined that the insurers are the buyers of the medical services, not the insureds.

While this conclusion has arisen principally in the antitrust context, the rationale is equally applicable to claims of tortious interference with a business relationship. *Bohtiuk v. Delaware Chiropractic Servs. Network, L.L.C.,* 1997 Del.Super. LEXIS 215 (April 11, 1997), includes the most extensive analysis of a claim of tortious interference related to the implementation of a restricted healthcare network. There, the court concluded that the insurer was privileged to reimburse whichever doctors it sought for its patients. As the entity that paid the bill, the decision to continue the reimbursement of services performed by healthcare providers for insureds belonged to the insurers, not to the healthcare providers. *See id.* at 12.

The court finds that there is little difference between the plight of plaintiff Drug Emporium and the plight of physicians excluded from healthcare provider networks. Indeed, it is the insurer's right as buyer and payer of the services to choose whom it buys its products and services from. Accordingly, as a matter of law, no business relationship existed between plaintiff and Vix customers; and thus, plaintiff's claim that the creation of the network constituted tortious interference with business relations is dismissed.

### 2. Tort Claims Against Tops and Rite Aid

■ In its complaint, plaintiff alleges that defendants Tops and Rite Aid tortiously interfered with the business relationship between plaintiff and defendant Blue Cross.[5] As indicated above, to state a claim for tortious interference with current or prospective business relations, plaintiff must allege: (1) business relations with a third party; (2) defendants' interference with those business relations; (3) that defendants acted with the sole purpose of harming the plaintiff or, where defendants acted to advance their own competing interests, that the defendants used dishonest, unfair, or improper means, such as criminal or fraudulent conduct; and (4) injury to the relationship. *Nadel,* 208 F.3d at 382 (2d Cir.2000).

Here, plaintiff alleges that prior to the creation of the network, plaintiff enjoyed an ongoing, mutually beneficial business relationship with Blue Cross. Item 1, ¶ 26. Plaintiff further claims that defendants Tops and Rite Aid knew or had reason to know of plaintiff's relationship with Blue Cross and intentionally interfered with that relationship. Item 1, ¶ 66. Specifically, plaintiff claims that the creation and proposed implementation of the exclusive pharmacy network not only violated antitrust law but also placed undue economic pressure on Blue Cross to terminate its relationship with plaintiff's Vix drugstores. *Id.* Plaintiff further claims that it was injured as a result of defendants' intentional interference, and that it will continue to suffer severe losses in revenue due to the creation of the exclusive network.

Setting aside the analysis of the antitrust claims, which at this time the court must, the issue becomes whether the allegations of economic pressure are sufficient to withstand defendants' motion to dismiss. On a motion to dismiss, the court is required to read the complaint with great generosity, *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989), and it is well settled that some degree of economic pressure may constitute wrongful means under the tortious interference analysis. *See Italian and French Wine Co. v. Negociants U.S.A.,* 842 F.Supp. 693, 702 (W.D.N.Y. 1993). Based on these standards, plaintiff's allegations that Tops and Rite Aid used economic pressure to force Blue Cross to terminate its relationship with plaintiff are sufficient to defeat defendants' motion to dismiss.

While defendants argue that in order to survive a motion to dismiss, plaintiff must distinguish the economic pressure "from the mere 'persuasion'" that is inherent in the "competitive market," the court does not agree that such a showing is required. Item 37 at p. 13. Whether plaintiff's allegations of economic pressure are of the degree necessary to sustain an action is a question of fact best answered upon summary judgment or at trial. Accordingly, defendants' motion to dismiss plaintiff's tortious interference action against Tops and Rite Aid (Count IV) is denied.

---

5. In its memorandum of law opposing the motions to dismiss, plaintiff re-characterizes its tort claim against Tops and Rite Aid as "interference with Plaintiff's contractual relationship with defendant Blue Cross." Item 36 at p. 17. Defendants contend that such a characterization is improper under *NBT Bancorp Inc., v. Fleet Norstar Financial Group, Inc.,* 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996); and *Guard–Life Corp., v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 193, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980), which held that tortious interference claims involving a terminable at-will contract can only be characterized as tortious interference with prospective contract rights or business relations. It is unnecessary for the court, however, to explore defendants' argument, as plaintiff and defendants agree that regardless of what the tort claim against Tops and Rite Aid is titled, plaintiff must satisfy the standard set forth by the Second Circuit in *Purgess v. Sharrock, supra,* and its progenies, *Nadel, supra,* and *Goldhirsh Group, Inc., v. Alpert,* 107 F.3d 105, 108–09 (2d Cir.1997), all of which require a showing of interference that is dishonest, wrongful, improper, or unfair.

## CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss is granted as to Count One and Three, but denied as to Count Four. The motion to dismiss Count Two of the antitrust claims is converted to a motion for summary judgment. A telephone conference will be held on Monday, July 10, 2000, at 2 p.m. to discuss a scheduling order. Buffalo counsel shall attend in chambers

So ordered.