**EXCELLUS HEALTH PLAN, INC., Plaintiff,**

v.

**Daniel T. TRAN, et al., Defendants.**

No. 03–CV–0095C(F).

United States District Court, W.D. New York.

Aug. 29, 2003.

Magavern, Magavern & Grimm, LLP (Thomas E. Schofield, Esq., of Counsel), Buffalo, NY, Sidley Austin Brown & Wood (Richard D. Raskin, Esq., of Counsel), Chicago, IL, for Plaintiff.

Colucci & Gallaher, PC (Anthony J. Colucci, III, of Counsel), Buffalo, NY, for Defendants Mylotte, Allentown Pediatric and Adolescent Medicine, Amherst Medical Associates, Amherst/Southgate ENT, Evergreen Women's Health Group, Euville, Forestsream Pediatrics, Geriatric Associates, and Sheridan Drive Medical Group.

Goldberg Segalla LLP (John P. Freedenberg, Esq., of Counsel), Buffalo, NY, for Defendants Lancaster/Southgate Medical Group.

Rupp, Baase, Pfalzgraf & Cunningham LLC (Lisa A. Coppola, Esq., of Counsel),

Buffalo, NY, for Defendants Tran, Edbauer, Health Care Solutions, and ETV.

### DECISION AND ORDER

CURTIN, District Judge.

Plaintiff Excellus Health Plan, Inc. ("Excellus") moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the counterclaims asserted against it by several defendants (Item 36). Oral argument of the motion was heard by the court on August 11, 2003. For the following reasons, plaintiff's motion to dismiss the counterclaims is granted in part and denied in part.

### BACKGROUND

Excellus operates two principal lines of business in Western New York: a health maintenance organization ("HMO") known as "Univera Healthcare," and six medical centers doing business as the "Lifetime Health Centers." Excellus commenced this action on February 5, 2003 against several physicians, administrators, and medical practice groups formerly affiliated with the Promedicus Health Group, LLP ("Promedicus"), shortly after Promedicus filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Western District of New York. Excellus alleges that the defendants conspired to orchestrate a mass resignation from Promedicus in late 2002 in order to divert patients from the Lifetime Health Centers to the defendants' new medical offices, and to divert enrollment from Univera Healthcare to other health insurance plans, resulting in group boycott, concerted refusal to deal, and price-fixing in violation of Section 1 of the Sherman Act (15 U.S.C.

§ 1) (Count I), tortious interference with current and prospective business relationships (Count II), unfair and deceptive trade practices (Count III), and unfair competition (Count IV) (*see* Item 1). The complaint seeks injunctive relief and compensatory and punitive damages, as well as treble damages under the Sherman Act (*id.*).[1]

On March 14, 2003, defendants Kathleen Mylotte, M.D., Allentown Pediatric and Adolescent Medicine, LLP, Amherst Medical Associates, LLP, Amherst/Southgate ENT, LLP, Evergreen Women's Health Group, LLP, Euville, LLP, Forestsream Pediatrics, LLP, Geriatric Associates, LLP, and Sheridan Drive Medical Group, LLP (collectively, "the Mylotte defendants") filed an answer containing counterclaims for tortious interference with business opportunities, tortious interference with contract, defamation, unfair competition, and deceptive trade practices (Item 21). Dr. Mylotte was the Chief Executive Officer of Promedicus and is designated as the "registered agent" of defendant Geriatric Associates, LLP (*id.* at ¶ 9). The remaining Mylotte defendants are medical practice groups formed in the fall of 2002 as limited liability partnerships ("LLPs"), consisting of former Promedicus physicians, including some who practiced at the Lifetime Health Centers.

Defendants Daniel T. Tran, Michael J. Edbauer, D.O., Health Care Solutions WNY, LLC ("HCS"), and ETV, LLC (collectively, "the Tran defendants") also filed their answer on March 14, 2003, asserting counterclaims for tortious interference, unfair competition, deceptive trade practices, defamation, and unjust enrichment (Item

---

1. There are no less than three other lawsuits pending in other courts involving the same core facts and many of the same parties involved in this action: *Promedicus v. Excellus,* No. 12002–1606 (Sup.Ct. Erie Co.); *Excellus v. Carlson,* No. 12003–407 (Sup.Ct. Erie Co.); and *Excellus v. Allentown Pediatric and Adolescent Medicine, LLP,* No. 03–1053K (Bankr. W.D.N.Y.).

23). Mr. Tran and Dr. Edbauer served as President and Medical Director of Promedicus, respectively, and are officers of defendants ETV and Health Care Solutions ("HCS"). ETV is described in the answer as a limited liability company ("LLC") functioning as the "sole owner" of HCS (Item 23, ¶¶ 73, 157). HCS is described as an independent limited liability company engaged in the business of managing physician practices and acting as billing agent for several of the medical practice LLPs sued as defendants in this case (*see* Item 46, pp. 2–3).

Defendant Lancaster/Southgate Medical Group, LLP ("Lancaster/Southgate"), also filed its answer on March 14, 2003, asserting counterclaims for tortious interference, unfair and deceptive trade practices, defamation, unjust enrichment, and violations of several New York State Department of Health regulations [2] (Item 24). Defendant Southwestern Medical Associates, LLP ("Southwestern"), filed its answer on March 31, 2003, asserting counterclaims for tortious interference, unfair and deceptive trade practices, and defamation (Item 32).

Defendant East Aurora Family Practice, LLP, filed its answer on March 18, 2003 (Item 25), and Springville Pediatrics and Adult Care, LLP, filed its answer on March 31, 2003 (Item 31). Neither of these defendants has asserted counterclaims.

On April 21, 2003, plaintiff filed its motion to dismiss the counterclaims (Item 36). The Tran defendants (Item 46), the Mylotte defendants (Item 49), and Lancaster/Southgate (Item 50) have filed memoranda of law in opposition to the motion,[3] and plaintiff has filed a reply (Item 54).

For the reasons set forth below, plaintiff's motion to dismiss the Mylotte defendants' tortious interference with contract counterclaims is granted, with leave to replead. Plaintiff's motion to dismiss is denied in all other respects.

### DISCUSSION

**I. Rule 12(b)(6)**

A motion to dismiss counterclaims is governed by the well-known standard for determining a motion under Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted. *See Wells Fargo Bank Northwest, N.A. v. Taca International Airlines, S.A.*, 247 F.Supp.2d 352, 363 (S.D.N.Y.2002). Under that standard, the court must liberally construe the counterclaims, accepting as true the facts alleged, and may dismiss the claims only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *quoted in Lerman v. Bd. of Elections of New York*, 232 F.3d 135, 140 (2d Cir.2000), *cert. denied*, 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001).

In reviewing the motion to dismiss, all reasonable inferences must be drawn in the counterclaimant's favor. *Bolt Electric, Inc. v. The City of New York*, 53 F.3d 465, 469 (2d Cir.1995). However, a court is not required to accept as true "conclusions of law or unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.1994), *cert. denied*, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). In order to survive a motion to dismiss under Rule 12(b)(6), the

---

**2.** Lancaster/Southgate has withdrawn its counterclaim based on alleged violations of the Department of Health regulations (*see* Item 50, p. 12 n. 2).

**3.** Southwestern has not responded to plaintiff's motion to dismiss.

counterclaim "must allege facts that, if true, would create a judicially cognizable cause of action." *South Road Associates v. International Business Machines Corp.,* 216 F.3d 251, 253 (2d Cir.2000). A motion to dismiss merely addresses the legal sufficiency of a claim, not the weight of the evidence. *See McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir.2000); *Church of Scientology International v. Time Warner, Inc.,* 806 F.Supp. 1157, 1159 (S.D.N.Y.1992), *aff'd,* 238 F.3d 168 (2d Cir.), *cert. denied,* 534 U.S. 814, 122 S.Ct. 40, 151 L.Ed.2d 13 (2001).

## II. Defamation

The first set of counterclaims addressed by plaintiff's motion to dismiss are defendants' defamation claims. Typical of these counterclaims are allegations based on statements made by some of plaintiff's officers and directors in advertisements and articles published in the *Buffalo News* and *Buffalo Business First* in January 2003. For example, the Tran defendants allege that on January 10, 12, and 13, 2003, plaintiff published an advertisement in the *Buffalo News* entitled "Important notice to our patients-" in the form of a letter dated January 9, 2003, which contained the following statements:

> Lifetime Health is bewildered and angered by news that Promedicus is going out of business. We do not understand how they could be bankrupt. In 2002 Univera Healthcare and SeniorChoice paid them approximately $10 million for services by the health center physicians and clinical providers. What Promedicus executives have done with that money is anyone's guess.
>
> \*      \*      \*      \*      \*      \*
>
> Lifetime Health views this bankruptcy filing as a ploy by Promedicus to breach its contract. . . .

(Item 23, ¶¶ 205–06 and Ex. A). The "letter" was signed by Timothy Finan, President, and Gregg Broffman, MD, Medical Director.

The Tran defendants also allege that plaintiff participated in the publication on January 9, 2003 of a *Buffalo News* article entitled "Promedicus group declares bankruptcy in dispute with HMO," under the byline of Henry L. Davis, which contained the following statements:

> "Most of the patients belonged to Univera before Promedicus was created," said Dr. Arthur Goshin, chief executive officer of Univera. "The doctors may not like the contractual arrangement, but it still obligates them to certain behavior."
>
> \*      \*      \*      \*      \*      \*
>
> Goshin characterized the bankruptcy filing as a ploy to break the agreement with Univera and take away its business.
>
> \*      \*      \*      \*      \*      \*
>
> Goshin harshly criticized the Promedicus physicians, arguing that they are misrepresenting the HMO's policies, hiding their true financial status and potentially failing to serve the best interests of their patients.
>
> "We've paid them millions of dollars to care for our patients. To say they are bankrupt is bewildering to us," he said. "The statement about not being able to exercise judgment is a lie. This is about money."
>
> Goshin threatened to file complaints against physicians who don't notify patients in a way that honors the contract. . . .

(*Id.* at ¶¶ 213–14 and Exs. B, C).

The Tran defendants further allege that a January 24, 2003 *Buffalo News* article by Mr. Davis contained the following statements:

But for Goshin, the breakup is very personal. . . . "This is all a scheme to take what isn't the

\*     \*     \*     \*     \*     \*

To Goshin, the bankruptcy looked like a deliberate strategy to get out of the contract and avoid staying at the medical centers until Sept. 30, while Lifetime arranged an orderly reassignment of patients to new doctors. He also alleges that Promedicus may have diverted funds to set up new offices for the doctors.

We paid them $10 million for 2002. To say they are bankrupt is bewildering to us," Goshin said.

(*Id.* at ¶¶ 219–20 and Exs. D, E).

The Tran defendants also allege that plaintiff caused and participated in the publication of a January 13, 2003 article in *Buffalo Business First* entitled "Promedicus bankruptcy filing irks Univera," under the byline of Annemarie Franczyk, which contained the following statements:

The medical group's assertion [in bankruptcy court filings] is a "damn lie," said Univera president Arthur Goshin.

"It's not true. It's simply an excuse of Promedicus leadership to divert attention from where the money is and what they have done with it," Goshin said. It's bewildering to us that with their enormous amount of money and their financial position, that they can declare bankruptcy.

\*     \*     \*     \*     \*     \*

Goshin said the Promedicus doctors' month-end departure date is tantamount to patient abandonment, which can cause the loss of their state licenses to practice.

(*Id.* at ¶¶ 225–26 and Exs. F, G). The Tran defendants allege that plaintiff knew the matters contained in these articles were false, and that as a result of plaintiff's involvement with these publications, Mr. Tran and Dr. Edbauer "have been held up to public contempt, ridicule, disgrace and prejudice; have suffered great mental pain and anguish and have been irreparably injured in their good names, business reputations and social standing . . ." (*id.* at ¶ 229).

Similarly, the Mylotte defendants assert in their defamation counterclaim that the statements in these advertisements and articles are false, and that the statements "were intended to and have caused harm to [the Mylotte] defendants both in their businesses and in the reputation of the physician owners who practice with [the Mylotte] defendants" (Item 21, ¶ 143). Lancaster/Southgate, in its defamation counterclaim, specifically adopts and incorporates the factual allegations and exhibits pertaining to the Tran defendants' defamation claim, and further alleges that "[i]nasmuch as the individual physician partners of Lancaster/Southgate were once members of Promedicus, the defamatory statements made by plaintiff's agents about Promedicus and its members likewise defamed [Lancaster/Southgate]" (Item 24, ¶ 160). Southwestern alleges that "[i]nasmuch as [its] individual physician members . . . were members of Promedicus, Plaintiff knew that the statements made in [the January 9, 2003 'letter'] advertisement would be reasonably understood by its readers to be about the individual physicians" (Item 32, ¶ 145).

■ Under New York law, the elements of a defamation claim include (1) a false and defamatory statement of fact, (2) "of and concerning" the plaintiff, (3) the publication of the statements to a third party, and (4) injury to the plaintiff. *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 61 (2d Cir.1993); *Murphy v. Cadillac Rubber & Plastics, Inc.,* 946 F.Supp. 1108, 1122

(W.D.N.Y.1996); *Christopher Lisa Matthew Policano, Inc. v. North American Precis Syndicate, Inc.,* 129 A.D.2d 488, 514 N.Y.S.2d 239 (1st Dep't 1987). Plaintiff primarily contends that the defendants cannot satisfy the second element ("of and concerning") in this case since none of the challenged statements identifies any of the individual or practice group defendants by name. Instead, the published statements make reference only to the Promedicus practice group, "Promedicus physicians," "Promedicus executives," and the "Promedicus leadership." According to plaintiff, since New York does not recognize a claim for "group libel," none of the defendants can show actionable defamation.

In this regard, in order to recover for defamation, it must be established that the alleged defamatory statements were "of and concerning the plaintiff." *Chicherchia v. Cleary,* 207 A.D.2d 855, 616 N.Y.S.2d 647, 648 (2nd Dep't 1994) (citing *Gross v. Cantor,* 270 N.Y. 93, 96, 200 N.E. 592 (1936)). Although the "of and concerning" requirement is generally regarded as an issue of fact for the jury to decide, the court may grant a motion to dismiss a defamation claim where the challenged statements "are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff." *Handelman v. Hustler Magazine, Inc.,* 469 F.Supp. 1048, 1050 (S.D.N.Y.1978), *quoted in Church of Scientology Int'l,* 806 F.Supp. at 1160. Thus, whether the complaint alleges facts sufficient to demonstrate a reasonable connection between the plaintiff and the alleged defamatory statement is a question for the court. *Cardone v. Empire Blue Cross and Blue Shield,* 884 F.Supp. 838, 847 (S.D.N.Y.1995).

In determining whether the "of and concerning" requirement has been sufficiently pleaded, the court must consider whether those who know the plaintiff, upon reading the statements, would understand that the plaintiff was the target of the allegedly libelous statement. *Id.; see also Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 925 (2d Cir.1987) ("It is not necessary that all the world should understand the libel."). The party alleging defamation need not be named in the publication, but in order to recover, that party must sustain the burden of pleading and proving that the defamatory statement referred to him or her. *Chicherchia,* 207 A.D.2d at 855–56, 616 N.Y.S.2d at 648.

> The reference to the party alleging defamation may be indirect and may be shown by extrinsic facts. But where extrinsic facts are relied upon to prove such reference the party alleging defamation must show that it is reasonable to conclude that the publication refers to him or her and the extrinsic facts upon which that conclusion is based were known to those who read or heard the publication.

*Id.,* 207 A.D.2d at 856, 616 N.Y.S.2d at 648 (citations omitted).

With respect to plaintiff's "group libel" argument, the case of *Brady v. Ottaway Newspapers, Inc.,* 84 A.D.2d 226, 445 N.Y.S.2d 786 (2nd Dep't 1981), is instructive. In *Brady,* twenty-seven City of Newburgh police officers who were part of a larger group of fifty-three officers who had not been indicted in a prior investigation of police corruption sued the *Times Herald Record* newspaper for libel, based on an editorial stating that the corruption could not have taken place without the guilty knowledge of the unindicted members of the police department. After initially noting that the trial court's denial of the defendants' motion to dismiss was proper since discovery had not yet been completed "and the necessary factual clarification of the major issues [had] not occurred ...," *id.,* 84 A.D.2d at 227, 445

N.Y.S.2d at 787, the Appellate Division, Second Department, undertook a comprehensive examination of the principles underlying New York's treatment of "group" defamation claims. The court distinguished "large group" claims involving "impersonal reproach of an indeterminate class," *id.*, 84 A.D.2d at 232, 445 N.Y.S.2d at 790, which are generally not actionable (*see Gross v. Cantor*, 270 N.Y. at 96, 200 N.E. 592), from actions by individuals belonging to a small group for defamation arising out of statements about the group. As stated by the Second Department:

> In contrast to the treatment of an individual in a large group which has been defamed, an individual belonging to a small group may maintain an action for individual injury resulting from a defamatory comment about the group, by showing that he is a member of the group. Because the group is small and includes few individuals, reference to the individual plaintiff reasonably follows from the statement and the question of reference is left for the jury.

*Brady*, 84 A.D.2d at 231, 445 N.Y.S.2d at 790 (citations omitted).

The *Brady* court rejected an absolute limitation on group defamation actions based on the size of the group alone. Rather, the court adopted an "intensity of suspicion" test to evaluate (in the context of cross-motions for summary judgment) whether or not to allow the group action to proceed. *See id.*, 84 A.D.2d at 235–41, 445 N.Y.S.2d at 793–95 (citing with approval *Fawcett Publications, Inc. v. Morris*, 377 P.2d 42, 51 (Okla.1962)) (allowing individual member of 70–man Oklahoma University football team to maintain libel suit against publisher of magazine article accusing team of taking amphetamines to improve performance), *cert. denied*, 377 U.S. 925, 84 S.Ct. 1218, 12 L.Ed.2d 217 (1964). In this test, the size of the group is considered as one factor to be balanced against other, non-exclusive reference elements such as the definiteness in number and composition of the group, its degree of organization and prominence, and the degree to which the defamatory comments focus on individual members. *See Brady*, 84 A.D.2d at 236, 445 N.Y.S.2d at 793; *cf. Anyanwu v. Columbia Broadcasting System, Inc.*, 887 F.Supp. 690, 693 (S.D.N.Y. 1995) (dismissing group libel claim based on statements made on *60 Minutes* concerning class of Nigerians engaged in international business with United States).

■ Giving the counterclaims' liberal construction, accepting as true the facts alleged, and drawing all reasonable inferences in favor of the counterclaimants in light of the legal standards discussed above, I find that the defendants have pleaded their defamation claims in sufficient detail to allow those claims to proceed to discovery and (if necessary) trial. The published statements were clearly directed at an identifiable group of "Promedicus physicians" who worked at plaintiff's Lifetime Health Centers, and even more specifically at the Promedicus leadership and executives which included Mr. Tran and Dr. Edbauer. Based on the matters set forth in these statements and in the counterclaim allegations, it is reasonable to conclude that the publication refers to the individual physicians now working in the defendant practice groups, and that the facts upon which that conclusion is based were known to those who read the publication-namely, the patients.

In addition, while the necessary factual clarification of the major issues in this case has yet to occur, it is clear from the pleadings that the statements attributable to plaintiff are sufficiently focused on individual Promedicus executives and physicians, considering the size and definitiveness of the group, its degree of organization, and

its prominence at the time the statements were made, to allow the court to find that the counterclaim allegations, if true, would create a judicially cognizable cause of action for defamation on behalf of the Tran, Mylotte, Lancaster/Southgate, and Southwestern defendants.

Accordingly, plaintiff's motion to dismiss the defamation counterclaims is denied.

### III. Tortious Interference with Contract

Plaintiff also moves to dismiss all counterclaims for tortious interference with contract.[4] Under New York law, there are four elements essential to the tort of intentional interference with contract: (1) the existence of a valid contract, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the breach of that contract, and (4) damages caused by the breach. *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir.) (citing *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993)), *cert. denied*, 516 U.S. 944, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995). Plaintiff contends that the defendants have failed to allege the most critical elements: the existence of a valid contract, and intentional inducement of breach. Instead, the counterclaims assert only vague, non-specific "contractual relations" and unspecified acts of interference with or disruption of those relations.

As plaintiff correctly notes, an allegation of interference with "contractual relations" is insufficient without reference to a valid existing contract with a third party, or any terms of the contract. *See G–I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233, 253 (S.D.N.Y.2001); *Mar-*

*tin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983). In this regard, only the Tran defendants have adequately pleaded tortious interference with an existing contract. Specifically, the Tran defendants allege that plaintiff has intentionally withheld payments to members of various physician practices in order to coerce the doctors to negotiate directly with Excellus, "in direct contravention of the contracts between HCS and the various physician practices and/or physicians who were not compensated by Excellus for services rendered to Excellus in January, February and March, 2003" (Item 23, ¶ 165). While no contractual terms are specified, the allegation does set forth the existence of contracts between defendant HCS and third-party physicians, and intentional conduct by plaintiff to induce the breach of those contracts—*i.e.*, withholding payment for services rendered to coerce physicians to deal directly with plaintiff rather than through HCS, their contracted billing agent. In this court's view, this information is sufficient to give plaintiff "fair notice of what the [counterclaim] is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99; *see Greater New York Automobile Dealers Association v. Environmental Systems Testing, Inc.*, 211 F.R.D. 71, 81 (E.D.N.Y. 2002).

The Mylotte defendants do not fare as well. The Mylotte defendants allege in their second counterclaim that they have "entered into numerous contracts with landlords, hospitals, other health maintenance organizations and vendors in an effort to conduct business in Western New York" (Item 21, ¶ 132), and that plaintiff interfered with those contracts by "communicating with the public, Excellus mem-

---

4. By this court's reading of the counterclaims, Lancaster/Southgate and Southwestern have alleged only tortious interference with business relations, not contractual relations (*see* Item 24, ¶¶ 146–53; Item 32, ¶¶ 125–35).

bers and patients of the Lifetime Health Centers, ... delaying participating provider numbers of former Promedicus physicians, ... [and] commencing this and other lawsuits" (Item 21, ¶ 133). The general reference to "numerous contracts" with various unidentified third parties, without specification of any valid, existing contract, the parties thereto, or the terms thereof, and without further detail as to how the plaintiff's conduct induced any third party breach, is insufficient to meet the pleading requirements outlined above.

Accordingly, plaintiff's motion is granted to the extent it seeks dismissal of the Mylotte defendants' counterclaim for tortious interference with contractual relations, with leave to replead. *Cf. Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

## IV. Tortious Interference With Prospective Business Relations

■■■ Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party, (2) the defendant's interference with those business relations, (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means, and (4) injury to the business relationship. *Nadel v. Play–By–Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000) (citing *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994)); *Drug Emporium, Inc. v. Blue Cross of Western New York, Inc.*, 104 F.Supp.2d 184, 191 (W.D.N.Y. 2000). Because courts are more protective of existing contractual relationships than prospective business relationships, a higher degree of interference is required to

plead the latter claim. *See Lane's Floor Coverings, Inc. v. Ardex, Inc.*, 1996 WL 19182, at *3 (E.D.N.Y. Jan. 4, 1996); *Italian & French Wine Company of Buffalo, Inc. v. Negociants U.S.A., Inc.*, 842 F.Supp. 693, 701 (W.D.N.Y.1993). "[T]he defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Fonar Corp. v. Magnetic Resonance Plus*, 957 F.Supp. 477, 483 (S.D.N.Y.1997). Actionable interference is not limited to criminal or fraudulent acts, but includes "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure . . . ." *Guard–Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980), *quoted in NBT Bancorp, Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 624, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996). Persuasion alone, even though knowingly directed at interference with the business relationship, is insufficient. *Id.*

■■■ In this case, the Tran defendants allege that they have business relationships with physician practice groups, individual practitioners, their patients, and other members of the public, and that plaintiff has interfered with those relationships in several ways, including (among other things) publication of false and misleading statements, violation of state regulations requiring HMOs to provide truthful and accurate marketing information, threatening legal action against former Promedicus physicians, and commencing costly litigation in multiple forums (*see* Item 23, ¶¶ 161–66). Similarly, the Mylotte defendants allege intentional interference with business opportunities as a result of plaintiff's misleading communica-

tions with the public, delaying participating provider numbers of former Promedicus physicians, and commencing this and other lawsuits (*see* Item 21, ¶ 127). Lancaster/Southgate alleges interference with the business relationship between its physician partners and their patients resulting from a litany of wrongful conduct, as outlined in the "Introduction and Relevant Facts" section of its counterclaims (*see* Item 24, ¶¶ 118–45; ¶¶ 147–53). Southwestern alleges that plaintiff misled Lifetime Health Center patients by reassigning them new primary care physicians while informing them that individual doctors associated with Southwestern would no longer be practicing in the Western New York area, and otherwise directly interfered with established physician/patient business relationships (*see* Item 32, ¶¶ 126–35).

These allegations sufficiently plead tortious interference with prospective business relationships on the part of the counterclaiming defendants to withstand plaintiff's motion to dismiss, under the standards set forth above. Plaintiff's reliance on this court's decision in *Drug Emporium* does not dictate a different result. That case involved an exclusive pharmacy network agreement under which Blue Cross of Western New York, a health insurance provider in the Buffalo area, proposed to limit its pharmacy coverage to prescriptions purchased only at certain pharmacies. Drug Emporium, owner of the Vix drugstores excluded from the network, sued Blue Cross and the network pharmacies claiming tortious interference with the business relationship between Drug Emporium and the Blue Cross insureds who purchased their prescriptions at the Vix stores. The court granted the defendants' motion to dismiss this claim, relying on cases from

several jurisdictions which hold that the insurer-rather than the insured-has the right as the purchaser of medical services to choose from whom it buys the services, and therefore no business relationship existed between Drug Emporium and Blue Cross insureds upon which a tortious interference claim could Blue Cross be based. *Drug Emporium,* 104 F.Supp.2d at 189.

As characterized by plaintiff, this holding supports the proposition that a health care insurer (such as Univera) is not a "third party" that can be held liable for tortious interference with the relationship between its insureds and their physicians. Whether or not this is a proper characterization of the holding in *Drug Emporium,* the counterclaims in this action are directed at plaintiff's conduct in its dual capacity as both health care insurer and operator of the Lifetime Health Centers. In this court's view, all of the counterclaimants have alleged sufficient facts which, if true, would sustain a finding that plaintiff's conduct in the wake of the Promedicus bankruptcy caused cognizable injury to the various defendants' business relationships with third parties, as outlined in the pleadings.

Accordingly, plaintiff's motion is denied to the extent it seeks dismissal of the counterclaims for tortious interference with prospective business relations.

## V. Unfair Competition

■ The Tran and Mylotte defendants have alleged unfair competition on the part of Excellus.[5] A claim for common law unfair competition in New York exists where the defendant (1) misappropriates the skill, expenditures, and labor of the plaintiff, (2) to its own commercial advantage, (3) in bad faith. *Roy Export Co. v.*

---

**5.** Neither Lancaster/Southgate nor South- western has alleged unfair competition.

*Columbia Broadcasting System*, 672 F.2d 1095, 1105 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). This cause of action encompasses an "incalculable variety" of illegal practices, *Ronson Art Metal Works, Inc. v. Gibson Lighter Manufacturing Co.*, 3 A.D.2d 227, 230, 159 N.Y.S.2d 606, 609 (1st Dep't 1957), broadly described as "any form of commercial immorality . . . ." *Metropolitan Opera Ass'n v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 796, 101 N.Y.S.2d 483, 492 (1950), *aff'd mem.*, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951).

■ Considering the scope of this type of common law action, I find that the Tran and Mylotte defendants have adequately alleged unfair competition on the part of Excellus. These defendants have generally alleged a course of conduct on the part of Excellus that has resulted in the unilateral reassignment of patients from a number of the defendant physicians and practice groups to Univera physicians, without patient authorization or approval. The Tran defendants also specifically allege, *inter alia*, that Excellus acted in bad faith by refusing to assign provider numbers to HCS clients, and by failing to make payments to HCS as required by both statute and contract (*see generally* Item 23, ¶¶ 171–90). The Mylotte defendants allege, *inter alia*, that Excellus has commenced lawsuits in several forums without a good faith basis to do so, communicated false information to patients, threatened individual physicians with financial harm, and refused to contact physicians when asked to do so by patients or in emergency situations.

Giving these claims liberal construction, accepting as true the facts alleged, and drawing all reasonable inferences in favor of the counterclaimants in light of the broad pleading requirements discussed above, I find that the Tran and Mylotte defendants have sufficiently stated claims for unfair competition upon which relief can be granted.

## VI. New York General Business Law § 349

■ Each of the counterclaimants has asserted a claim under Section 349 of New York General Business Law, which makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ." N.Y. Gen. Bus. Law § 349(a). To state a claim for deceptive practices under this statute, a plaintiff must allege (1) that the act, practice, or advertisement was consumer-oriented, (2) that the act, practice, or advertisement was misleading in a material respect, and (3) that the plaintiff was injured as a result of the deceptive practice, act, or advertisement. *Pelman v. McDonald's Corp.*, 237 F.Supp.2d 512, 525 (S.D.N.Y.2003); *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000).

Typical of the counterclaims for violation of Section 349 are the Tran defendants' allegations that, "[w]ith a specific intent to deceive, Excellus has made numerous materially misleading statements to the clients and business associates of these answering defendants about their ability to provide services to physicians and other health care providers in the Western New York area" (Item 23, ¶ 192), that this conduct "threatens the general public in that it is designed to destroy the [Tran defendants'] business . . ., leaving consumers and others with fewer choices in the community" (*id.*, ¶ 194), and that defendants "have been damaged in an amount to be determined at trial" (*id.*, ¶ 195). Plaintiff contends these allegations are insufficient because the defendants, as competitors of plaintiff, cannot claim any cognizable injury to consumers at large.

While it is true that the primary focus of Section 349 is consumer protection, *see Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 24, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995), it is also true that the courts have allowed competitors to challenge deceptive practices under Sections 349 "so long as some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995), *cert. denied*, 516 U.S. 1114, 116 S.Ct. 916, 133 L.Ed.2d 846 (1996). The critical concern is "whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor." *Id.; see also Capitol Records, Inc. v. Wings Digital Corp.*, 218 F.Supp.2d 280, 286 (E.D.N.Y. 2002).

Under these standards, the counterclaimants' allegations that Excellus has caused harm to the public at large by engaging in deceptive conduct designed to limit consumers' health care choices in the community, in violation of Section 349 of New York General Business Law, are sufficient to withstand plaintiff's motion to dismiss.

## VII. Unjust Enrichment

Plaintiff also moves to dismiss the Tran defendants' and Lancaster/Southgate's counterclaims for unjust enrichment. Under New York law, "a plaintiff seeking an equitable recovery based on unjust enrichment must first show that a benefit was conferred upon the defendant, and then show that as between the two parties enrichment of the defendant was unjust." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 263 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Spencer Trask Software and Information Services LLC v. RPost Intern. Ltd.*, 2003 WL 169801, at *14 (S.D.N.Y.

Jan. 24, 2003). The counterclaimants have alleged that Excellus has wrongfully withheld payments due for services rendered, resulting in unjust enrichment (*see* Item 23, ¶¶ 232–33; Item 24, ¶¶ 168–69). Accepting these allegations as true, and drawing all reasonable inferences in favor of the counterclaimants, I find that the Tran and Lancaster/Southgate defendants have adequately pleaded that a benefit was conferred upon plaintiff and that plaintiff was unjustly enriched at defendants' expense. Accordingly, plaintiff's motion to dismiss the unjust enrichment counterclaims is denied.

## CONCLUSION

Based on the foregoing, plaintiff's motion (Item 36) to dismiss the counterclaims asserted against it is granted in part and denied in part. The Mylotte defendants' counterclaim for tortious interference with contract is dismissed, with leave to replead. Any amended pleading shall be served and filed by the Mylotte defendants within twenty days from the date of this order. Plaintiff shall serve and file responsive pleadings in accordance with the Federal Rules of Civil Procedure.

So ordered.